UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

| | |
|---|---|
| FAUZIA F. QAMAR, : | |
|     Plaintiff : | |
| : | CASE NO. 3:18-CV-01359 (JBA) |
| v. : | |
| : | |
| SHERIDAN HEALTHCARE OF : | |
| CONNECTICUT, P.C., : | |
|     Defendant : | DECEMBER 2, 2019 |
| : | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I.    <u>INTRODUCTION</u>

       Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56 of this District, Sheridan Healthcare of Connecticut, P.C. ("Sheridan") hereby moves this Court for an entry of summary judgment as to all seven counts of the operative Second Amended Complaint of Plaintiff Fauzia Qamar, M.D., dated February 15, 2019.[1]

II.    <u>SUMMARY</u>

       In short, this case amounts to nothing more than the textbook situation in which longstanding employees—male and female alike—who were used to an easy and flexible manager react negatively to a new manager's more stringent management style.  It is undisputed that Plaintiff is one of the employees who reacted negatively to her new manager and that she lodged complaints about his management style with Sheridan management.  It is also undisputed that Plaintiff's new manager formally performance-managed Plaintiff for the same performance issues noted by her previous manager.  And it is undisputed that when Plaintiff flagrantly

---

[1] References to the operative Second Amended Complaint are cited as "Compl."

violated the terms of this formal performance management—that spanned the course of well over a year and culminated in a final, job-determinative Performance Improvement Plan ("PIP")—it was Sheridan senior management, not her manager, who made the decision to terminate Plaintiff's employment.

As explained more fully below, all of the material, undisputed evidence in this case demonstrates that Plaintiff's claims are not only implausible but unsustainable as a matter of law. Accordingly, Defendant respectfully requests that this Court summarily dismiss all seven counts of the Complaint.

III.    FACTUAL BACKGROUND

Sheridan is a multi-specialty medical group that embeds its employees within hospitals throughout the country, including at Day Kimball Hospital ("DKH") in Putnam, CT, where Sheridan was under contract to provide a group of anesthesia medical professionals. Exhibit K, Guslits Dep. Tr., pp. 20:6-10; Exhibit V, Graham Dep. Tr., pp. 10:23-11:3.[2]

Plaintiff entered into an Employment Agreement with Sheridan in September 2004 and began working at DKH in October 2004. Exhibit B, Pl. Dep. Tr., pp. 56:23-57:1; Exhibit Y.[3]   Plaintiff's Employment Agreement provided that Sheridan could terminate her employment for cause, upon written notice, for *inter alia*: "(1) negligence, misfeasance or malfeasance in connection with performing or discharging Employee's obligations under this Agreement or (2) commissions of acts that in any way jeopardize or damage the professional integrity, reputation or relationship of the Company or any of its Affiliates." Exhibit Y.

When Plaintiff started at DKH, the anesthesia department was staffed by four anesthesiologists and three Certified Registered Nurse Anesthetists ("CRNAs"). Exhibit B, Pl.

---

[2] Certified copies of excerpts of deposition transcripts are attached hereto.
[3] Exhibits as authenticated at depositions are attached hereto and described in the accompanying index.

Dep. Tr., pp. 60-61.   Steven Schimmel, M.D., was the Chief of Anesthesia, and Plaintiff's supervisor.   Exhibit A, Schimmel Dep. Tr., pp. 12:19-22.   By all accounts, Dr. Schimmel was a laid-back manager.   *See* Exhibit A, Schimmel Dep. Tr. pp. 16:18-17:22, 24:16-25:2-4 (explaining he did not issue discipline to his subordinates); Exhibit B, Pl. Dep. Tr., pp. 98:13-20 (describing being "happy" with Dr. Schimmel's management but DKH wanting him to "do a little more").

From the beginning of her tenure Plaintiff regularly displayed defensive, angry, unprofessional behavior at work.   Plaintiff yelled at her colleagues in front of patients and other non-departmental employees.   Exhibit A, Schimmel Dep. Tr., pp. 16:18-20; *see also* Exhibit N, Deborah Lutner Dep., pp. 72:17-73:4; Exhibit R, Chervenkov Dep. Tr., pp. 23:17-25:3; Exhibit S, Soliman Dep. Tr., pp. 121-122.   Plaintiff would lose her temper like this multiple times a month over various mundane workplace matters.   Exhibit A, Schimmel Dep. Tr., pp. 16:25-17:2; *see also* Exhibit N, Lutner Dep. Tr., p. 74:15-75:20 (describing multiple people who were aware of Plaintiff losing her temper).   Dr. Schimmel counseled Plaintiff frequently about her behavior. Exhibit A, Schimmel Dep. Tr., pp. 16:11-24.   When Dr. Schimmel addressed the issues with her, Plaintiff invariably responded unprofessionally and defensively.   Exhibit A, Schimmel Dep. Tr., pp. 17:17-18:7; see also Exhibit N p. 74:21-24.   And, although clinically, Plaintiff's performance was "adequate," she did have some clinical issues (e.g., placing epidurals in obese laboring patients), to which she responded to feedback with the same defensiveness.   Exhibit A, Schimmel Dep. Tr., pp. 20:2-20, 23; Exhibit S, Soliman Dep. Tr., pp. 120:14-121:8.

In January 2015, Ahmed Soliman, M.D., who had been a staff anesthesiologist at DKH since 2014, became the Chief of the anesthesia department and Plaintiff's new supervisor. Exhibit B, Pl. Dep. Tr., pp. 102:17-22; 103:22-25.   At that time, DKH administration was

unhappy with the anesthesia services being provided by Sheridan.  Exhibit V, Graham Dep. Tr., pp. 30:11-31:21.  Dr. Soliman had a different, stricter style of management than Dr. Schimmel.  Exhibit A, Schimmel Dep. Tr., pp. 70:18-71:4; Exhibit R, Chervenkov Dep. Tr., p. 18:10-18.  DKH administration was happy with the changes made under Dr. Soliman and his new management style.  Exhibit V, Graham Dep. Tr., pp. 28:2-30:10.  However, as is frequently the case when a stricter manager takes over, Sheridan staff—both male and female—expressed concerns about Dr. Soliman's management style.  *See* Exhibit S, Soliman Dep. Tr., pp. 183:21-184:11; Exhibit V, Graham Dep. Tr., p. 26:6-23; Exhibit A, Schimmel Dep. Tr., p. 70:2-71:4.

Plaintiff made it clear that she was not happy with the new rules and management style of Dr. Soliman.  Plaintiff's job—for which she was compensated at well-over a quarter million dollars a year—was no longer "easy" under Dr. Soliman.  *See* Exhibit F at Bates No. SHERIDAN 693 (describing her job as "very easy" before Dr. Soliman); *see also* Exhibit B, Pl. Dep. Tr., pp. 165:23.  Quite simply, Plaintiff did not respect Dr. Soliman – primarily because he expected her (and all others in the department) to work hard and effectively.  Exhibit B, Pl. Dep. Tr., pp. 151: 4-5; *see also* Exhibit BB (staff meeting reiterating the rules to be followed by all).  Dr. Soliman's demand that all Sheridan clinicians provide excellent and efficient care was getting in the way of Dr. Qamar's desire not to work.  Exhibit B, Pl. Dep. Tr., pp. 76:3-6 (Plaintiff's testimony that "I had to take care of certain things pertaining to my family, and I didn't wanted [sic] to work."); Exhibit D; Exhibit BB ("The Anesthesia department is a small team of providers and we ALL should work together to provide excellent care and efficient delivery of our service.").  Dr. Qamar made her desire not to work clear by complaining vocally about her work assignments and schedule.  Exhibit A, Schimmel Dep. Tr., pp. 55-59; Exhibit B, Pl. Dep. Tr., pp. 166:17-169:22; Exhibit F at Bates No. SHERIDAN 693; Exhibit DD; Exhibit E;

Exhibit FF, Mardani Dep. Tr., pp. 21:2-12, 34:17-35:16.  Plaintiff also would ask her colleagues to do her work.  Exhibit A, Schimmel Dep. Tr., pp. 68:22-69:14; Exhibit S, Soliman Dep. Tr., p. 104:6-105:3.  Nor did Plaintiff want to follow the new rules, such as punching in and out of work or carrying the phone that allowed for immediate contact throughout the hospital.  Exhibit B, Pl. Dep. Tr., pp. 106:8-16, 149:5-20; Exhibit D ¶¶ 2, 3.  Plaintiff expressed her discontent to everyone and anyone who would listen – including sending long, rambling text messages complaining about Dr. Soliman.  Exhibit AA; Exhibit V, Graham Dep. Tr., p. 25:7-21; Exhibit E; Exhibit Z.  Dr. Soliman struggled to manage Plaintiff's behavior and confirmed with Dr. Schimmel that Plaintiff's behavior had been an ongoing concern.  Exhibit A, Schimmel Dep. Tr., pp. 54-55.

Another example of Plaintiff's consistent complaining about Dr. Soliman without a full understanding of the demands he was juggling in running the department related to "running the board."  Plaintiff complained that she wanted to "run the board"—meaning the doctor in charge of scheduling and coordinating anesthesia assignments for the day—even though she did not have the aptitude to do so.  Exhibit B, Pl. Dep. Tr., pp. 61:20-63:14.  Dr. Schimmel testified he rarely if ever asked Plaintiff to run the board because she was too "dogmatic" and "didn't have the insight that's necessary to match up the proper provider with the proper cases or the proper surgeons."  Ex. A, Schimmel Dep. Tr., p. 67:5-8.  Dr. Soliman had a similar assessment of Plaintiff's ability and did not think she had the skills or demeanor necessary to run the board effectively.  Exhibit S, Soliman Dep. Tr., pp. 125:16-128:11.  Moreover, after Dr. Soliman took over as Chief, DKH administration requested that whenever possible, only the Chief and Vice Chief run the board.  Exhibit R, Chervenkov Dep. Tr., p. 34:16-23, 61:2-4; Exhibit S, Soliman Dep. Tr., p. 42:7-12.

On March 18, 2016, Dr. Soliman met with Plaintiff to discuss this ongoing pattern of unprofessionalism.  Exhibit S, Soliman Dep. Tr., p. 100:11-16.  As was Plaintiff's pattern in response to any feedback she perceived as negative, she reacted defensively and without self-reflection.  Exhibit EE at Bates No. SHERIDAN 839.  And then she immediately emailed Sheridan management—Dr. Drozdow, President, and Dr. Roger Brown, Regional Medical Director, and Dr. Guslits, Senior Vice-President for Anesthesiology—to complain about Dr. Soliman.  Exhibit C; Exhibit B, Pl. Dep. Tr., pp. 131.  Plaintiff's reactionary email complained that Dr. Soliman "delegate[ed] work," treated employees like "slaves and peasants," and was "always after someone for petty things," and made "the department like a first-grade classroom." Exhibit C.  Plaintiff's defensiveness was apparent as she claimed she was a "hard working person" and went on to accuse Dr. Soliman – her supervisor – of not "do[ing] his fair share." Exhibit C. Although Plaintiff used the words "harassment" and "retaliating" in her email, her complaints related only to her discontent with Dr. Soliman's management and clinical skills— she neither stated nor could her words objectively have been interpreted to mean Dr. Soliman was treating her differently or retaliating against her because she was a woman.  *See* Exhibit C; Exhibit N, Lutner Dep. Tr., p. 202:17-21; Exhibit K, Guslits Dep. Tr., p. 39:12-17.

Within three business days of her complaint, Deborah Lutner (formerly Parsons), Director of Operations, Northeast, and Dr. Guslits traveled to DKH and meet with Plaintiff and investigate the concerns raised in her email.  Exhibit B, Pl. Dep. Tr., pp. 137, 233:21-234:5; Exhibit K, Guslits Dep. Tr., pp. 131.  Dr. Guslits and Ms. Lutner met with six DKH employees and three Sheridan employees, Plaintiff, Dr. Soliman, and Dr. Chervenkov.  Exhibit K, Guslits Dep. Tr., pp. 132, 134; Exhibit L.

Dr. Guslits and Ms. Lutner had intended to meet with Plaintiff and Dr. Soliman and other Sheridan employees to discuss Plaintiff's stated concerns about Dr. Soliman. When they arrived, however, Plaintiff informed them that she had scheduled meetings for them with five DKH surgeons to discuss her clinical skills. Exhibit K, Guslits Dep. Tr., pp. 135:5-11. Two of these surgeons also had submitted letters to Sheridan, attesting to their view of Dr. Qamar's clinical skills, despite the fact that, as surgeons and not anesthesiologists, they were not in a position to fully evaluate Plaintiff's clinical skills. Exhibit K, Guslits Dep. Tr., pp. 129; Exhibit V, Graham Dep. Tr., p. 45:10-17. Dr. Guslits and Ms. Lutner nonetheless accommodated Plaintiff's request that they entertain these meetings. Exhibit K, Guslits Dep. Tr., pp. 129:12-130:2, 135:5-11, 135:19-136:15. And, as a result of Plaintiff putting her clinical skills at issue, they assessed those skills as part of the investigation, thereby learning, *inter alia*, that Plaintiff had difficulties placing labor epidurals; sometimes did not remove epidurals at the end of a case; was historically slow in attending to epidural requests; and was in charge of a room during a procedure in which a CRNA gave a patient a wrong-side nerve block. Exhibit K, Guslits Dep. Tr., pp. 138:3-6, 143:7-11, 145:12-24, 151:22-153:4; Exhibit L. Also, in response to Plaintiff's contention that she was the hardest-working member of the department, Dr. Guslits examined the department's "GTE" numbers, a calculation used by Sheridan to assess how many hours fewer than 80 in a two-week period the physicians work. Exhibits K, Guslits Dep. Tr., pp. 156:8-16, 172:8-13, 176:18-21; Exhibit S, Soliman Dep. Tr., p. 311:24. According to the report pulled for the timeframe in which they were conducting the investigation, Plaintiff had, by far, the highest GTE amongst all physicians:

| Anesthesiologist | GTE (hours) | Cumulative Hours Worked > 80 hours/pay period |
|---|---|---|
| Ahmed MD | 21 | 111 |
| Chervenkov MD | 43.75 | 94 |
| Qamar MD | 173 | 1.5 |
| Shimmel MD | n/a | n/a |
| Srinivasan MD | 115 | 44 |

Exhibit L.

Following this extensive investigation, Dr. Guslits and Ms. Lutner concluded that Dr. Soliman's management style was too aggressive and that Plaintiff exhibited highly unprofessional behaviors that escalated to defensive, disrespectful ones in the face of any constructive management feedback. *See* Exhibit L. Dr. Guslits drafted an investigation report in which he noted this and the fact that the anesthesia group at DKH needed to figure out how to work together as a team. Exhibit L. To that end, he recommended that Dr. Soliman work on his management style and Plaintiff work on her professionalism. Exhibit K, Guslits Dep. Tr., pp. 198:16-21; Exhibit L. Accordingly, Ms. Lutner coached Dr. Soliman on communicating more effectively with the team and addressing issues directly with clinicians.[4] Exhibit N, Lutner Dep. Tr., p. 149:2-14. Dr. Guslits also instructed Ms. Lutner to follow up with the DKH team to ensure they were working together. Exhibit K, Guslits Dep. Tr., pp. 196:7-17. In addition, Dr. Guslits and Ms. Lutner encouraged Dr. Soliman to document the issues he discussed with Plaintiff that prompted her complaint. Exhibit B, Pl. Dep. Tr., pp. 146:1-10; Exhibit L; *see also* Exhibit D. Dr. Soliman did so that same day and included in that list of expectations that Plaintiff work as a team player, be flexible, and respect him and his decisions. Exhibit D at ¶ 6;

---

[4] Plaintiff also had policy disagreements with D. Soliman's clinical decisions. She reported to Dr. Guslits and Ms. Lutner that she had some "concerns regarding Dr. [Soliman's] clinical competency." Exhibit L. Plaintiff complained that Dr. Soliman rushed pre-op assessments and critiqued his care of a specific patient. Exhibit C. As Dr. Soliman testified, however, that after he became Chief he instituted changes in how procedures were handled to make them more efficient and to satisfy complaints from DKH. Exhibit S, Soliman Dep. Tr., p. 89. Dr. Guslits and Ms. Lutner investigated these concerns and determined that the patient "had an uneventful post-operative course." Exhibit L.

*see also* Exhibit G.   Plaintiff understood these expectations and thanked Dr. Guslits for the meeting.  Exhibit B, Pl. Dep. Tr., pp. 154:20-23, 155:15-156; Exhibit G.   Dr. Guslits committed to return in May 2016 to check in with Plaintiff, which he did, at which point Plaintiff reported everything was fine and again thanked him.  Exhibit B, Pl. Dep. Tr., p. 194:14-195, 197:12-16, 198:1-7; Exhibit GG.

Following the transmission of written performance/demeanor expectations to Plaintiff and these two meetings, Plaintiff improved her professionalism for a period of time.[5] Exhibit S, Soliman Dep. Tr., p. 136:6-14.  Dr. Soliman acknowledged this improvement - in fact, in her October 28, 2016 review, he marked Plaintiff as meeting expectations in all but one category.  Exhibit I.   There were a few hiccups throughout 2016, however, which Sheridan addressed with Plaintiff.  On April 27, 2016, for example, Dr. Guslits had to instruct Plaintiff to stop complaining about post-call work.  Exhibit H.

Slowly throughout 2017, however, Plaintiff's professionalism started to revert back to regularly engaging in the behaviors for which she had been repeatedly counseled, and in the winter of 2017, her behavior had become intolerable.  On December 4, 2017, Dr. Soliman circulated a draft of Plaintiff's performance review to Dr. Brown, Ms. Lutner, and Juanita Brown, the Practice Manager.  Exhibit T.  After management discussed the low scores proposed by Dr. Soliman, Dr. Guslits decided that a PIP was indicated by Plaintiff's behavior.  Exhibit N, Lutner Dep. Tr., p. 156:8-11; Exhibit S, Soliman Dep. Tr., p. 242:9-13. Accordingly, Dr. Soliman drafted a PIP for Plaintiff, and he (along with Juanita Brown) met with Plaintiff on December 7, 2017 to discuss it.  Exhibit J.  In sum, Dr. Soliman messaged in this meeting/the PIP, that Sheridan's expectations of Plaintiff were the same as those that had been highlighted

---

[5] Dr. Soliman also occasionally raised minor concerns about Plaintiff's clinical practice.  These clinical issues were not a significant concern to Sheridan management.  Exhibit K, Guslits Dep. Tr., pp. 119:12-23.

over the past year and a half:  stop complaining about the amount and type of work assigned; stop watching the clock; and control temper.  Exhibit J.  Plaintiff's response to this feedback was so aggressive and unprofessional—she even accused Dr. Soliman of lying—that Ms. Brown had to ask her to calm down and noted that she now had firsthand insight into the issues for which they were performance managing her.  Exhibit S, 251:19-253:4; Exhibit B, Pl. Dep. Tr., pp. 231:6-233:4.

A few weeks after being placed on the PIP—in the early morning hours of December 30, 2017—out of the blue Plaintiff began sending rambling text messages to her colleagues, bizarrely accusing Dr. Soliman of "harass[ing]" her, "professional abuse," and characterizing him as an "indecent, evil being."  Exhibit M; Exhibit P; *see also* Exhibit O.  This was the first complaint Sheridan management had heard from Plaintiff about Dr. Soliman since early 2016.  Exhibit M; Exhibit N, Lutner Dep. Tr., p. 147:15-20.  In separate texts, Plaintiff made a preposterous and incoherent accusation against Dr. Soliman—to her co-workers, to Juanita Brown and to Dr. John Graham, DKH's Chief Medical Officer—that Dr. Soliman had "tempered" with her drugs the day before.  Exhibit B, Pl. Dep. Tr., pp. 263, 268:10-269:10, 271:3-13; Exhibit P; Exhibit AA at Bates No. P001; Exhibit CC at Bates No. P022.  Although she never saw him do so, Plaintiff apparently created an unsubstantiated belief that Dr. Soliman had come into her room and replaced her syringe of propofol medication with a different syringe, even though Plaintiff concedes there was no patient harm or other indication of any issue.  Exhibit B, Pl. Dep. Tr., pp. 253-255:14, 257:24-258:4-16.  Plaintiff also conceded she was not supposed to leave her medication out on a tray in a room unattended.  Exhibit B, Pl. Dep. Tr., pp. 70:10-71:13, 255:19-256:9.

10

Plaintiff's colleagues sent some of Plaintiff's text messages to Dr. Soliman, who forwarded them to Dr. Guslits.  Exhibit O.  On December 31, 2017, Dr. Guslits reviewed the text messages (including the one in which she called her Chief an "indecent, evil being,"), which he viewed as being in contravention of the requirements of her PIP.  Exhibit K, Guslits Dep. Tr., pp. 110:8-111:14.  Accordingly, on that day Dr. Guslits decided to terminate Plaintiff's employment. Exhibit II at Bates No. SHERIDAN 456; Exhibit K, Guslits Dep. Tr., pp. 71:22-72:8.  As a result, on January 1, 2018 he contacted Plaintiff and instructed her not report to work the following day, then on January 2, 2018, he told her not to report to work until further notice. Exhibit K, Guslits Dep. Tr., pp. 208:22-25; Exhibit Q; Exhibit B, Pl. Dep. Tr. pp. 287:6-288:9. By that evening of January 2nd, Plaintiff had hired an attorney.  Exhibit HH.

Plaintiff testified she understood at this time her job was in jeopardy.  Exhibit B, Pl. Dep. Tr., 279-280.  It was only then, after hiring an attorney and with the recognition that her employment was about to be terminated, that Plaintiff suddenly re-characterized her concerns about Dr. Soliman's management as motivated by gender or any other unlawful animus. Plaintiff transformed her complaint on January 5, 2018, in a phone call with Tony Ames, Human Resources Manager, and Anthony Katz, Director of Human Resources—after her newly-retained attorney sent an email to Sheridan management mirroring her new characterization of events. Exhibit U, Katz Dep. Tr., pp. 181:14-16, 184:6-7, 189:22-190:2.

Although Sheridan had previously investigated and resolved Plaintiff's complaints about Dr. Soliman, because she was now suddenly claiming the actions were the result of gender animus, the human resources professionals advised that the situation should be reviewed again before communicating the final termination decision to Plaintiff.  As a result, they conducted an investigation of Plaintiff's new complaints of gender discrimination.  Exhibit

U, Katz Dep. Tr., p. 122:12-23.  Tony Ames and Anthony Katz spoke with both Plaintiff and Dr. Soliman, and then Mr. Ames interviewed two CRNAs, Mary Miller and Aziz Anzari, and the Practice Manager, Juanita Brown.  Exhibit U, Katz Dep. Tr., p. 183:20-185:8.  Following this investigation, they found Plaintiff's complaints of discrimination and retaliation to be unsubstantiated.  Exhibit U, Katz Dep. Tr., p. 151:19-152:15, 201:10-202:1.  Ms. Lutner also spoke to Dr. Soliman about Plaintiff's accusation that Dr. Soliman had tampered with her drugs, and Dr. Soliman explained he obviously had not done anything untoward with medication Plaintiff left on her cart and noted how outrageous that accusation was. Exhibit N, Lutner Dep. Tr., pp. 142-43.

Following the investigation by Human Resources, Dr. Guslits did not change his mind about the decision to terminate Plaintiff's employment, which he made effective as of January 23, 2018.  Exhibit K, Guslits Dep. Tr., p. 25:11-13, 70:22-71:1; Exhibit X.  Dr. Soliman took no part in the decision to terminate Plaintiff's employment, and in fact, testified that he wanted Plaintiff "to stay," because it is "very difficult to hire anesthesiologists," and he would have an "overload of work if she [left]."  Exhibit S, Soliman Dep. Tr., p. 72:3-13, 296.

The same month she was terminated, Plaintiff turned down a job offer from New York Presbyterian Hospital at an equivalent or greater salary to Sheridan.  Exhibit B, Pl.'s Dep. Tr., p. 309:1-7, 311:3-313.   Two months later, in March 2018, she similarly turned down a job offer from UMass Memorial Health Care.  Exhibit B, Pl.'s Dep. Tr., p. 319-21.  She ultimately accepted employment with Anesthesia Associates of Willimantic in October of 2018.  Exhibit B, Pl.'s Dep. Tr., p. 328.

IV.   PROCEDURAL POSTURE

After filing with the CT Commission on Human Rights and Opportunities, Plaintiff initiated this action by complaint dated August 12, 2018.  (Docket Entry No. 1). Plaintiff amended her complaint twice, and the counts comprising the operative Second Amended Complaint are as follows:

FIRST COUNT:        Gender Discrimination in Violation of Title VII;
SECOND COUNT:  Gender Discrimination in Violation of Connecticut Fair
                              Employment Practices Act ("CFEPA");
THIRD COUNT:        Retaliation in Violation of Title VII;
FOURTH COUNT:   Retaliation in Violation of CFEPA;
FIFTH COUNT:        Violation of Conn. Gen. Stat. § 31-51q;
SIXTH COUNT:        Breach of Contract; and
SEVENTH COUNT: Defamation

V.    SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; its requirement is that there be no *genuine issue of material fact*." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (citations omitted; emphasis in original).  For purposes of a motion for summary judgment, a fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

Once "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . .. [T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no

*genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis in original; citation omitted). An employer is entitled to summary judgment "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010). "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007).

## VI.    ARGUMENT

### A.    Sheridan Is Entitled to Summary Judgment on Counts One and Two Because Plaintiff Was Terminated For a Legitimate, Non-Discriminatory Reason That Plaintiff Cannot Show Was Pretextual.

Counts One and Two allege Plaintiff was "denied . . . supervisory opportunities, prestige and promotional opportunity as male anesthesiologist who were deemed sufficient qualified to be running the board and when Defendant terminated her employment." Compl., Counts One and Two, ¶¶ 33. The legal analysis applicable to Plaintiff's discrimination claim in Counts One and Two is identical: to withstand summary judgment, Plaintiff must demonstrate an inference of discrimination under the three-tiered burden-shifting test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and its progeny.[6]

Under the first tier of this test, Plaintiff is required to present a *prima facie* case of discrimination by demonstrating that: (1) she is a member of a protected class; (2) she was qualified for the position; and (3) she was subjected to an adverse employment decision under circumstances giving rise to an inference of discrimination. *McDonnell Douglas Corp.*, 411 U.S.

---

[6] Because the Connecticut Supreme Court looks to federal precedent when interpreting and enforcing the CFEPA, federal courts uniformly hold that the analysis of gender discrimination claims brought under that Act is identical to that employed in assessing the claim under federal law. *See, e.g.*, *Marzano v. S. New Eng. Tel. Co*., No. 3:16-cv-1274 (JAM), 2018 U.S. Dist. LEXIS 154017, at *6, 2018 WL 4341149 (D. Conn. Sep. 10, 2018).

at 802; *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir. 1997), *cert. denied,* 522 U.S. 1075 (1998).   If Plaintiff establishes a *prima facie* case, the burden then shifts to Defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.   *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citation omitted).   Once Defendant has met its burden of production, Plaintiff must demonstrate that the legitimate reasons offered by Defendant were not the true reasons for the adverse action but were instead merely a pretext for impermissible discrimination.   *Reeves*, 530 U.S. at 143.   "Although the intermediate evidentiary burden shifts back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."   *Id.* at 143 (citation omitted; internal quotations omitted).

"To overcome summary judgment, Plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action. . .. To get to the jury, it is not enough . . . to disbelieve the employer; the fact finder must also believe the plaintiff's explanation of intentional discrimination." *Weinstock v. Columbia University*, 224 F.3d 33, 43 (2d Cir.2000) (internal quotation marks and alterations omitted).   In short, a court should not "[i]nfer discrimination from thin air" and a plaintiff must provide more than speculation to defeat summary judgment. *See Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir. 1998).

Here, it is undisputed that Plaintiff sent a text message to her colleagues, denigrating her Chief, within weeks of being placed on a PIP regarding her lack of professionalism. *See* Exhibit M.  Nothing about these circumstances gives rise to an inference of discrimination, and Plaintiff cannot demonstrate that this reason was mere pretext for terminating

her on the basis of her sex.  *See Fleming v. MaxMara USA, Inc.*, 371 F. Appx. 115, 118 (2d Cir. 2010) ("Only where an employer's business decision is so implausible as to call into question its genuineness should [a] court conclude that a reasonable trier of fact could find that it is pretextual."); *Ghent v. Moore*, 324 F. Appx. 55, 57 (2d Cir. 2009) ("[I]t is well settled that in discrimination cases, the Court should not serve as "super-personnel departments," reviewing employer disciplinary decisions.").  Indeed, Plaintiff has *no* evidence that the decision maker in this case, Dr. Guslits, had any discriminatory bias.  Notably, Dr. Soliman was not involved in the decision to terminate Plaintiff's employment, and it is undisputed that he did not want her employment to be terminated because she would be difficult to replace, ultimately resulting in more work for him.  Exhibit S, Soliman Dep. Tr., p. 72:3-13, 296; *see also* Exhibit K, Guslits Dep. Tr., p. 25:11-17.

Finally, Plaintiff's claim that she was discriminated against insofar as she was denied promotional and supervisory opportunities and the "prestige" of running the board is specious.  First, Plaintiff not being regularly assigned to run the board is not an adverse employment action because Plaintiff suffered no material harm from that decision.  *See Zoulas v. N.Y.C. Dep't of Educ.*, No. 1:18-cv-2718-GHW, 2019 U.S. Dist. LEXIS 147664, at *51, 2019 WL 4090057 (S.D.N.Y. Aug. 29, 2019) (failing to provide plaintiff with professional development opportunities did not rise to the level of an adverse employment action).[7]  Second, even assuming *arguendo* it does constitute an adverse employment action, Dr. Schimmel— whom Plaintiff does not allege discriminated against her—concurred with Dr. Soliman's assessment that Plaintiff lacked the requisite skills and demeanor to run the board.  Ex. A, Schimmel Dep. Tr., p. 67:5-8.  And, any inference of sex discrimination is negated by the fact that Dr. Soliman testified that Dr. Schimmel—a male—also did not run the board because *he*

---

[7] Unreported cases are attached hereto as Exhibit JJ.

lacked the requisite skills.  Exhibit S, Soliman Dep. Tr., pp. 129:1-10.  Moreover, it is undisputed that DKH requested that only the Chief and Vice-Chief run the board. Exhibit R, Chervenkov Dep. Tr., p. 34:16-23, 61:2-4; Exhibit S, Soliman Dep. Tr., p. 42:7-12.  In light of these facts, Plaintiff cannot possibly establish the discriminatory bias necessary to overcome Defendant's legitimate, non-discriminatory reason for not regularly assigning Plaintiff to run the board.

Accordingly, Counts One and Two warrant the entry of summary judgment. *See Zubrow v. Solvay Pharmaceuticals*, Civ. No. 03CV1929 (WWE), 2006 U.S. Dist. LEXIS 7039, 2006 WL 288381 (D. Conn. Feb. 3, 2006) (granting summary judgment where plaintiff was unable to demonstrate that a termination for unsatisfactory work performance and failure to satisfy her PIP goals was a pretext for discrimination).

B.  <u>Sheridan is Entitled to Summary Judgment on Counts Three and Four Because There is No Evidence of a Causal Connection Between any Protected Activity and the Termination of Plaintiff's Employment</u>

In Counts Three and Four, Plaintiff asserts that the termination of her employment and denial of the opportunity to run the board was in retaliation for complaining about discrimination and harassment.  As with her claims of discrimination, the legal analysis applicable to Count Three (retaliation in violation of Title VII) is identical to that applicable to Count Four (retaliation in violation of the Connecticut Fair Employment Practices Act/CFEPA). *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010) (applying the legal standard used in assessing Title VII retaliation claims to similar claims pursued under the CFEPA).

As the U.S. Supreme Court recently ruled in *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013), Plaintiff must demonstrate that the sole, "but for" reason for her termination was retaliatory animus on the part of the termination decision-maker. *Id.* (holding that retaliation claims must be proven according to traditional principles of but-for

causation, not the lessened causation test of 'motivating factor' applied to status-based discrimination claims). Although it is unclear whether the "but-for" test applies to Plaintiff's CFEPA retaliation claim,[8] even under the "motivating factor" *McDonnell Douglas* burden-shifting framework analysis, Plaintiff's claim of retaliation would fail.

To establish a prima facie case of retaliation, Plaintiff must show that: (1) she participated in a protected activity known to Sheriden; and (2) she was subjected to an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308-09 (2d Cir. 1995); *Kaytor*, 609 F.3d at 552, 556. Once Plaintiff establishes a prima facie case, Defendant must proffer a legitimate, non-retaliatory reason for its actions. Thereafter, the burden then shifts back to Plaintiff to prove that Defendant's reason was merely a pretext for retaliation. *Dixon v. Int'l Fedn. of Accountants*, 416 Fed. Appx. 107, 110-11 (2d Cir. 2011); *Tomka*, 66 F.3d at 1308.

As an initial matter, Plaintiff cannot establish she engaged in protected activity prior to January 5, 2018. Plaintiff's March 2016 email complaining about Dr. Soliman's management style and clinical skills does not amount to protected activity. *See Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 103 (2d Cir. 2011) (affirming that "generalized" complaints that supervisors was making plaintiff's life miserable did not amount to protected activity); *Saliga v. Chemtura Corp.*, No. 12-cv-832 (VAB), 2015 U.S. Dist. LEXIS 133135, at *45, 2015 WL 5797000 (D. Conn. Sep. 30, 2015) ("Complaints presenting general allegations of harassment unrelated to protected class are not protected activity under Title VII . . . or CFEPA."); *Miller v. Edward Jones & Co*, 355 F. Supp. 2d 629, 643 (D. Conn. 2005) (granting summary judgment on retaliation claim because "a reasonable fact-finder could not conclude"

---

[8] *Jones v. Natchaug Hosp., Inc*., No. 3:17cv1099 (JBA), 2019 U.S. Dist. LEXIS 164716, at *23 n.2, 2019 WL 4723066 (D. Conn. Sep. 25, 2019) (noting discrepancy in causation standard applied to CFEPA retaliation claims by state and federal courts).

plaintiff's complaints that her supervisor was "very demanding" amounted to protected activity). Indeed, none of the individuals who came to DKH to discuss Plaintiff's complaint with her in-person viewed her complaints as gender-based.  Lutner Dep. Tr., p. 202:20-21.

Nor can Plaintiff establish a causal connection between any alleged protected activity and an adverse employment action.  Assuming a denial of an assignment to run the board constitutes an adverse employment action (see Section VI.A, *supra*), Plaintiff cannot establish that Sheridan assigning running the board to more-capable physicians than Plaintiff was retaliatory.  Indeed, Dr. Schimmel did not assign Plaintiff to run the board when he was Chief, well ***before*** Plaintiff allegedly engaged in any protected activity, even considering the March 2016 email.  Ex. A, Schimmel Dep. Tr., p. 67:5-8.

As for her termination, Plaintiff cannot show a causal connection between Dr. Guslits' legitimate, nondiscriminatory reason for terminating Plaintiff's employment—her failure to meet the requirements of her PIP—and any protected activity.  Even assuming Plaintiff's March 2016 complaint about Dr. Soliman's management style and clinical skills amounts to protected activity, this came nearly two years prior to her termination on January 23, 2018.  Exhibit C.  Such a long lapse between protected activity and adverse action negates any retaliatory motive.  *See, e.g.*, *Douglas v. City of Waterbury*, 494 F. Supp. 2d 112, 125 (D. Conn. 2007) ("In the Second Circuit and district courts within the Second Circuit, time periods greater than one year have been found, in general, to be insufficient to establish this temporal relationship.").  This is especially true when Plaintiff received a positive performance review in the interim, receiving nearly all "meets expectations" on her October 2016 performance review. *Dayes v. Pace Univ.*, 2 F. App'x 204, 208 (2d Cir. 2001) (intervening positive review defeated attempt to establish a causal connection).

In addition, Plaintiff cannot rely on her January 5, 2018 complaint as the basis for her retaliation claim.  By this point, Plaintiff was admittedly aware that her employment was likely to be terminated, and she had already hired an attorney.  Exhibit K, Guslits Dep. Tr., pp. 208:22-25; Exhibit Q; Exhibit B, Pl. Dep. Tr. pp. 279-280, 287:6-288:9; Exhibit HH.  Plaintiff's January 2018 complaint thus was nothing more than Plaintiff's last-minute attempt to save her job by re-characterizing her ongoing performance management as discriminatory, this time framing it in the context of gender discrimination.  Accordingly, it cannot form the basis of her retaliation claim.  *See Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 519 (S.D.N.Y. 2010) ("Put bluntly, [p]laintiff cannot use the threat of a discrimination lawsuit to immunize himself from the reasonable and foreseeable consequences of his misconduct, especially misconduct that pre-dates any protected activity.").  This is especially true here, where twenty-three days into her PIP, Plaintiff still could not contain her angry outbursts about her Chief. Exhibit M; Exhibit P.  And, importantly, as noted, it was Dr. Guslits, not Dr. Soliman, who was the sole termination decision-maker.  Exhibit K, Guslits Dep. Tr., p. 25:11-17.  In fact, not only is it undisputed that Dr. Soliman had no input into the termination decision, he testified he absolutely did not want Plaintiff's employment to be terminated.   Exhibit S, Soliman Dep. Tr., p. 72:3-13, 296.

Plaintiff has not adduced any evidence necessary to support a rational finding that Plaintiff's protected activity was the but-for reason, or even a motivating factor, in Sheridan's termination of her employment, rather than the legitimate, non-discriminatory reason that she failed to adhere to the requirements of her PIP.  Accordingly, Plaintiff's claims that Sheridan engaged in unlawful retaliation warrant summary dismissal.

20

C. <u>Sheridan is Entitled to Summary Judgment on Count Five Because Plaintiff Spoke Only Pertaining to Her Official Duties and She Has No Evidence of Pretext</u>

Plaintiff alleges she was retaliated against for making complaints "related to threats to patient safety."  As an initial matter, Plaintiff's purported speech was nothing more than disagreements with how Dr. Soliman ran the department and a bizarre, unsubstantiated claim that Dr. Soliman somehow tampered with her drugs.  None of this amounts to protected speech, but even if it did, Plaintiff cannot establish causation, as it is clear that no one to whom Plaintiff complained viewed her complaints as concerning or rising to the level of a patient safety concern.

Section 31-51q of the Connecticut General Statutes creates a cause of action for damages when an employee has been subjected to "discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state…."  A retaliation claim under section 31-51q requires Plaintiff to establish three elements: (1) she engaged in speech protected by the federal or state constitution, (2) she was disciplined or discharged because of that speech, and (3) a causal connection between the allegedly adverse employment action and her protected speech.  *See, e.g.*, *Weinstein v. University of Connecticut*, 136 F. Supp. 3d 221, 231 (D. Conn. Jan. 22, 2016).

Plaintiff cannot establish a prima facie case of retaliation because her speech, which was *not* constitutionally protected under either the federal or state constitution, did not *cause* any adverse employment action.

1.      Plaintiff's Alleged Speech Related to "Patient Safety" Was Part-And-Parcel of Her Official Duties As a Physician

Courts routinely deny retaliation claims predicated on speech made "in the course of [an employee's] employment duties," as this expression is not constitutionally protected. *Schumann*, 304 Conn. at 589 (directing judgment for defendant on section 31-51q retaliation claim because "on-the-job" speech is not protected by first amendment); *see also Cobb v. Atria Senior Living, Inc*., No. 3:17-cv-00291 (MPS), 2018 U.S. Dist. LEXIS 13725, at *22, 2018 WL 587315 (D. Conn. Jan. 29, 2018) ("Courts have found that employee speech regarding patient safety in fields related to healthcare is unprotected by the First Amendment."); *Lenox v. Town of North Branford*, 2012 U.S. Dist. LEXIS 174419, at *33, 2012 WL 6102470 (D. Conn. Dec. 7, 2012), *rev'd in part on other grounds* 2013 WL 2155523 (D. Conn. May 16, 2013) (granting summary judgment under Connecticut law because plaintiff's speech "pursuant to his official duties" was not protected speech).  Specifically, in *Schumann*, the Connecticut Supreme Court defined the context of employment duties, holding that "on-the-job" speech is made "**pursuant to an employee's duties [and] part and parcel of his concerns about his ability to properly execute his duties**." *Id.* at 614 (emphasis added, citation and internal quotation marks omitted). The *Schumann* Court further determined that "[t]he key inquiry is 'whether the speech activity stemmed from and [was of] the type…that [the employee] was paid to do…." *Id.* Moreover, the "ultimate question" is whether the employee "speaks as a citizen or instead as [an] employee." *Id.* And, "a relevant factor" in that assessment "is whether the employee took her complaints to persons outside the workplace or whether she took them up the chain of command to her supervisors." *Carlson v. Sheriden Woods Health Care Ctr., Inc.*, No. HHDCV116025384S, 2012 Conn. Super. LEXIS 472, at *15, 2012 WL 753756 (Super. Ct. Feb. 14, 2012) (citing *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008)).

In this case, Plaintiff merely complained to her colleagues, the hospital, and management about her personal gripes about her supervisor.  She did not speak outside her official capacity as a physician.   *Urashka v. Griffin Hosp.*, 841 F. Supp. 468, 474 (granting defendant's motion to dismiss plaintiff's § 31-51q claim on the basis that plaintiff's voiced concerns about workplace mismanagement and her work schedule were not matters of public concern); *Brown v. City of New Britain Board of Educ.*, CV116011012, 2015 Conn. Super. LEXIS 2528, at *9, 2015 WL 6499734 (Conn. Super. Ct. Oct. 1, 2015) (complaints about insufficient resources and OSHA violations were "made as part of the plaintiff's official duties [as a teacher]" as a matter of law and not constitutionally protected); *see also Schumman*, 304 Conn. at 615 (concerns about patient safety are part and parcel of job as pathologist); *Gwozdz v. Genesis Physician Servs.*, No. 13cv317 (AWT), 2014 U.S. Dist. LEXIS 31113, at *11 (D. Conn. Mar. 11, 2014) (granting motion to dismiss because APRN's complaints about "deficiencies and errors in patient charting, as well as in patient care, medication delivery and administration" to Department of Labor and to the Board of Examiners for Nursing did not change the fact that complaints "owed their existence to [plaintiff's] job duties and were made in furtherance of those duties").

Accordingly, and as a matter of law, Plaintiff's speech and conduct was in her official capacity, and her speech is not protected by the First Amendment.

2.    Plaintiff's Speech Was Not Protected By the Connecticut Constitution.

The Connecticut Supreme Court applies a different—but also strict—standard for section 31-51q free speech claims arising under the Connecticut Constitution.  *Trusz v. UBS Realty Investors, LLC*, 319 Conn. 175 (2015).  Section 31-51q only protects employee speech under the Connecticut Constitution if an employee's speech is on a matter of public concern and

implicates an employer's "official dishonesty, deliberately unconstitutional acts, other serious wrongdoing, or threats to health and safety." *Id.* at 210-212 (adopting the modified *Pickering/Connick* balancing test announced by Justice Souter in his *Garcetti* dissent).[9] Conversely—and just like 31-51q claims arising under the federal constitution—"if an employee's job related speech reflects a mere policy difference with the employer, it is not protected" under our state constitution. *Id.* at 212.

Here, Plaintiff concededly had policy differences with Dr. Soliman on how to run the department of anesthesiology at DKH. Plaintiff did not like the changes Dr. Soliman had made in order to run the department more efficiently and satisfy Sheridan's client, DKH. Exhibit C; Exhibit S, Soliman Dep. Tr., p. 89. As to her preposterous claim that Dr. Soliman switched out her syringe of propofol, even then, Plaintiff was unable to identify any potential harm to the patient. Exhibit B, Pl. Dep. Tr., p. 258:9-16. Accordingly, because Plaintiff raised nothing more than a policy disagreement with her Chief, her speech is also not protected under the Connecticut Constitution.

### 3.  Plaintiff Cannot Establish Causation

In the alternative, Plaintiff's retaliation claim fails because she cannot establish causation between her alleged protected speech and Sheridan's decision to terminate her employment. Courts reject Section 31-51q claims where, as here, there is no evidence that any protected speech "was a substantial or motivating factor in the employer's decision to [discipline] or discharge him." *Lowe v. Amerigas, Inc.*, 52 F. Supp. 2d 349, 359-360 (D. Conn. 1999) (entering judgment for employer on section 31-51q claim for lack of causation); *Konspore v. Friends of Animals, Inc.*, 10vc613, 2012 U.S. Dist. LEXIS, at *56-57, 2012 WL 965527 (D.

---

[9]  The Connecticut Supreme Court's decision in <u>*Trusz*</u> applies equally to speech in a private workplace for section 31-51q claims arising under our state constitution. *Trusz*, 319 Conn. at 217.

Conn. Mar. 20, 2012) (same).  In short, the Court should dismiss the 31-51q claim because there is no evidence in the record to suggest that Plaintiff's purported speech had anything to do with the termination decision.

As set forth in Section VI.A, *supra*, Defendant has presented substantial evidence that Plaintiff was terminated for failure to follow her PIP when she texted her co-workers denigrating her Chief.  In light of this, Plaintiff is left with no evidence whatsoever of causation or retaliatory intent.  *Lowe v. AmeriGas, Inc.*, 52 F.Sup.2d 349, 360 (D. Conn. 1999), aff'd, 208 F.3d 203 (2d Cir. 2000) ("[F]inding no evidence from which a reasonable jury could conclude that plaintiff's protected speech entered into the decision to terminate him or that it was a substantial or motivating factor in his termination, we grant summary judgment in favor of defendant on plaintiff's section 31-51q claim"); *Picone v. Aquarion Water Co.*, No. FBTCV156050419, 2016 Conn. Super. LEXIS 2653, at *16 (Super. Ct. Oct. 21, 2016) (granting summary judgment on 31-51q claim because Plaintiff unable to meet burden on causation in light of defendant's "substantial evidence to support its argument that the plaintiff was fired due to his poor job performance").  Because Plaintiff cannot establish that her purported speech was a substantial or motivating factor in the decision to terminate her employment, the Court should grant summary judgment in Sheridan's favor.

D. <u>Count Six Fails Because Sheridan Had Cause to Terminate Plaintiff's Contract and Plaintiff Has no Damages</u>

1. <u>Sheridan Had Cause to Terminate Plaintiff's Contract</u>

Plaintiff is unable to establish that Sheridan lacked cause to terminate her contract. *See Hawley Ave. Assocs., LLC v. Russo*, 130 Conn. App. 823, 832 (2011) ("The elements of a breach of contract action are the formation of an agreement, performance by one

party, breach of the agreement by the other party and damages." (emphasis added; internal quotation marks omitted)).

Sheridan had cause to terminate Plaintiff's contract, which specifically identified "negligence" and "commission of acts that in any way jeopardize or damage the professional integrity, reputation or relationship of the Company or any of its Affiliates." Exhibit Y. After placing Plaintiff on a PIP for, among other things, her inability to control her temper, a mere three weeks later, Plaintiff was unable to control herself when she texted her colleagues, calling her Chief an "indecent, evil being," and Dr. Graham—a DKH employee—and making serious, unsubstantiated allegations against Dr. Soliman. Exhibit M. According to Dr. Guslits, these text messages denigrating her Chief created an "unsafe practice environment" because the group needs to follow the leadership of the Chief to ensure patient care. Exhibit K, pp. 110:8-111:14. Plaintiff's conduct in reaching out to her colleagues and DKH's Chief Medical Officer placed the professional integrity of Dr. Soliman in question, thus potentially damaging Sheridan's professional integrity, reputation, and relationship with DKH, in violation of her contract. As set forth in more detail in Section VI.A, supra, Plaintiff was terminated for texting her colleagues and denigrating her Chief, which is sufficient cause to terminate her Employment Agreement "for cause." Accordingly, Plaintiff cannot establish that Sheridan breached the Employment Agreement when it terminated Plaintiff's employment pursuant to the "with cause" provision and summary judgment is appropriate on Count Five.

2.    Plaintiff Has No Damages

Proof of damages is an essential element of a breach of contract claim. *Rosato v. Mascardo*, 82 Conn. App. 396, 411 (2004). Without in any way conceding Sheridan breached

26

the Employment Agreement, because Plaintiff cannot prove damages due to any alleged breach in this case, her contract claim fails.

"It is axiomatic that the burden of proving damages is on the party claiming them. . . . When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty." *Frillici v. Westport*, 264 Conn. 266, 283 (2003) (internal quotation marks omitted).  "Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. Thus, the court must have evidence by which it can calculate the damages, which is not merely subjective or speculative, but which allows for some objective ascertainment of the amount." *CAS Construction Company v. Town of East Hartford*, 82 Conn. App. 543, 556 (2004).  In other words, "speculative claims for damages are not allowable in breach of contract cases." *Gyadu v. Progressive Cas. Ins. Co.*, No. CV145016049S, 2015 Conn. Super. LEXIS 2955, at *6 (Super. Ct. Dec. 1, 2015); W. *Haven Sound Dev. Corp. v. W. Haven*, 201 Conn. 305, 320 (1986) (explaining that the law does not permit prospective damages that are too "speculative and remote").

Plaintiff is not entitled to any back pay as an award of damages for her breach of contract claim because she declined two positions in January and March of 2018.  Exhibit B, Pl.'s Dep. Tr., pp. 309:1-7, 319-21.  Plaintiff concedes that she would have been making the same or more at New York Presbyterian Hudson Valley Hospital--$400,000 to $700,000—which she turned down the same month Sheridan terminated her employment.  Exhibit B, Pl.'s Dep. Tr., pp. 311:3- 313.  Accordingly, Plaintiff is unable to establish she suffered any damages from any alleged breach by Sheridan, and her breach of contract claim fails as a matter of law.

E.  <u>Count Seven Fails Because Sheridan Did Not Make Any Defamatory Statements, And Even If It Did, It Is Protected By Qualified Privileged</u>

Plaintiff alleges that Dr. Soliman's critiques of her performance, contained in Plaintiff's performance evaluation and PIP and in summaries to Sheridan management, were defamatory.   (Compl. Count Seven ¶¶ 33-34).   Summary judgment should be granted on Plaintiff's defamation claims against Defendants because there is no genuine issue of material fact as to whether Sheridan made defamatory statements. Additionally, even if the Court were to conclude that statements Defendants made could be construed as defamatory, any such statements were protected by qualified privilege.

1.    <u>Sheridan Did Not Make Any Defamatory Statements</u>

Sheridan is entitled to summary judgment as to Plaintiff's defamation claim because it did not make any defamatory statements.

"A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. . .. To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Hopkins v. O'Connor*, 282 Conn. 821, 838, 925 A.2d 1030 (2007) (internal quotation marks omitted).

"To prevail on a common-law defamation claim, [the] . . . plaintiff must prove that the defendant published *false* statements about her . . .." *Daley v. Aetna Life & Casualty Co.*,

249 Conn. 766, 795 (1995) (emphasis added).[10]   Truth is an absolute defense to a claim of

defamation. *See Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 112 (1982).

"To be actionable, the statement in question must convey an objective fact, as generally, a

defendant cannot be held liable for expressing a mere opinion." *Daley v. Aetna Life & Casualty

Co.*, 249 Conn. 766, 795 (1999).

Plaintiff has proffered no information that would create a genuine issue of

material fact relating to her claims of defamation.  Dr. Soliman's statements about Plaintiff's

performance and clinical skills were either true (as evidenced by Dr. Schimmel's concurring

assessment of her abilities) or mere opinion, neither of which is actionable as defamation. *See*

Exhibit A, Schimmel Dep. Tr., pp. 16:11-24, 17:8-10, 18:1-18, 20:2-20, 23:7-12.  As such,

Defendants are entitled to summary judgment on Plaintiff's defamation claims as a matter of

law.

2.   <u>Any Allegedly Defamatory Statements Were Protected By A Qualified Or
Conditional Privilege</u>

Even if the alleged statements by Defendants could be construed as defamatory,

summary judgment is appropriate as to Plaintiff's defamation claims because such alleged

statements are protected by a qualified or conditional privilege.

"One who publishes defamatory matter concerning another is not liable for the

publication if (a) the matter is published upon an occasion that makes it conditionally privileged

and (b) the privilege is not abused."  Restatement (Second) of Torts § 593.  "An occasion makes

a publication conditionally privileged if the circumstances lead any one of several persons

---

[10] While Plaintiff asserts claims of defamation *per se*, the distinction is of no moment for the purposes of
this motion, as alleging defamation *per se* only relieves a plaintiff from establishing the existence of
injury. *See Pollack v. Eitelberg*, 2012 Conn. Super. LEXIS 2910, at *30, 2012 WL 6634693 (Conn.
Super. Ct. Nov. 30, 2012) ("Alleging defamation per se relieves the plaintiff of offering proof as to the
injury element of defamation claims, but does not alleviate the duty to prove the other three elements of a
prima facie case for defamation . . .").

having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know." Restatement (Second) of Torts, § 596. "The essential elements of [a qualified privilege] defense are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion and publication in a proper manner to proper parties." *Decker v. Martin*, 2010 Conn. Super. LEXIS 168, at *15, 2010 WL 625794 (Conn. Super. Ct. Jan. 19, 2010).

In the employment context, there is a qualified privilege for statements made between management regarding an employee's performance and employment status. *See Torosyan v. Boehringer Ingelheim Pharm.*, 234 Conn. 1, 29, 662 A.2d 89, 103 (1995) ("[C]ommunications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege. Such communications and documents are necessary to effectuate the interests of the employer in efficiently managing its business.").

A plaintiff may overcome the qualified privilege only by establishing "that the holder of the privilege acted with malice in publishing the defamatory material." *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 630 (2009).  Malice can be either "'actual malice,' namely, the publication of a false statement with actual knowledge of its falsity or reckless disregard for its truth, or 'malice in fact,' namely, the publication of a false statement with bad faith or improper motive." *Id.* at 633-34.

Here, all of Dr. Soliman's statements occurred in the context of evaluating or managing Plaintiff's performance and correlating discussions with Sheridan management about the best way to do so.  Nor has Plaintiff adduced any evidence to support malice on the part of

Dr. Soliman.  Accordingly, any purportedly defamatory statements by Sheridan are protected by qualified privilege and Plaintiff's defamation count fails.

VII.    <u>CONCLUSION</u>

For all of the foregoing reasons, Defendant respectfully requests that this Court enter summary judgment in its favor on all counts of Plaintiff's Complaint.

Respectfully submitted,
THE DEFENDANT

By:     *s/ Holly L. Cini*
Holly L. Cini (ct 16388)
holly.cini@jacksonlewis.com
Carolyn A. Trotta (ct 30220)
carolyn.trotta@jacksonlewis.com
Jackson Lewis P.C.
90 Statehouse Square, 8th Floor
Hartford, CT  06103
P: (860) 522-0404
F: (860) 247-1330

<u>CERTIFICATION OF SERVICE</u>

I hereby certify that on December 2, 2019, a copy of the foregoing Defendant's Memorandum in Support of Motion for Summary Judgment was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*s/ Carolyn A. Trotta*
Carolyn A. Trotta