UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| FAUZIA F. QAMAR,<br>    *Plaintiff*,<br>    *v.*<br>SHERIDAN HEALTHCARE OF CONNECTICUT, P.C.,<br>    *Defendant*. | Civil No. 3:18cv1359 (JBA)<br><br><br>August 6, 2020 |

**RULING GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Dr. Fauzia Qamar brings claims against her former employer Defendant Sheridan Healthcare for gender discrimination, retaliation, breach of contract, and defamation. Defendant moves for summary judgment on all seven counts of Plaintiff's complaint. (Def.'s Mot. for Summ. J. [Doc. # 72].) The Court heard oral argument on Defendant's motion on June 5, 2020. For the reasons that follow, Defendant's motion is granted.

## I. Background

Defendant Sheridan Healthcare of Connecticut, P.C. ("Sheridan") "is a multi-specialty medical group that embeds its employees within hospitals throughout the country, including at Day Kimball Hospital ('DKH') in Putnam, CT, where Sheridan was under contract to provide a group of anesthesia medical professionals." (Parties' L.R. Stmts. [Docs. ## 72-2, 77-1] ¶ 1.) Plaintiff Dr. Fauzia Qamar began her employment with Sheridan in September 2004 and began working at DKH in October 2004. (*Id.* ¶ 2.) Plaintiff's employment with Sheridan was governed by an Employment Agreement which provided that Sheridan could terminate her employment "for cause" upon written notice for "(1) negligence, misfeasance or malfeasance in connection with performing or discharging Employee's obligations under this Agreement or (2) commissions of acts that in any way jeopardize or damage the professional integrity, reputation or relationship of the Company or any of its Affiliates." (*Id.* ¶ 3 (quoting Exhibit Y (Employment Agreement) to Defs.' Mot. for Summ. J. [Doc. # 72-5] at 7).)

### A.  Plaintiff's Behavior and DKH

Defendant asserts that "Plaintiff yelled at her colleagues in front of patients and other non-departmental employees," but Plaintiff disputes that description of her behavior. (*Id.* ¶ 6.) When Plaintiff began working at DKH, her supervisor was Dr. Steven Schimmel, the Chief of Anesthesia. (*Id.* ¶ 4.) Dr. Schimmel testified that he had at times rated Plaintiff's "conduct as it pertains to professionalism" as deficient because she "would frequently argue with colleagues or other people in front of patients, in front of nondepartmental members, and get into shouting matches," which happened "fairly regularly." (Schimmel Dep. at 16:11-23.) Deborah Lutner, the Director of Northeast Operations for Sheridan, testified that Dr. Chervenkov, a colleague of Plaintiff at DKH, had told her that Plaintiff "had gotten angry in the hallway" and was "complaining to the OR staff and the nurses there" and that Plaintiff "complained to [Dr. Chervenkov] in an angry manner." (Ex. N. (Lutner Dep.) to Def.'s Mot. for Summ. J. [Doc. # 72-5] at 72:11-73:4.) Ms. Lutner also testified that Dr. Chervenkov had described Plaintiff's demeanor as "loud, animated, not calm." (*Id.*) Dr. Soliman, who was Plaintiff's supervisor after Dr. Schimmel, testified that Plaintiff had an "explosive temper" and that "every time . . . anybody tries to give her any feedback or talk to her about certain things . . . she really gets very upset." (Ex. S. (Soliman Dep.) to Def.'s Mot. for Summ. J. [Doc. # 72-5] at 120-122.) He testified that her "explosive temper" included "emotion, emotional, yelling" at "[w]hoever that she's mad at," including when there were other people around. (*Id.*) Dr. Soliman testified that this behavior was "frequent" and occurred in various places, including "[t]he hallways," "the PACU" (the postanesthesia care unit), and "in pre-op." (*Id.*)

However, Dr. John Graham, the Chief Medical Officer at DKH, testified that he did not witness any problems with Plaintiff's interpersonal interactions. (Ex. 2 (Graham Dep.) to Pl.'s Opp. [Doc. # 78-2] at 12-13.) Dr. Chervenkov testified that he never witnessed Plaintiff "being abusive to anyone who worked at the hospital" but that he would "describe her as being highly emotional . . . and explosive," although sometimes she was "emotional without being

explosive." (Ex. 1 (Chervenkov Dep.) to Pl.'s Opp. [Doc. # 78-1] at 23-24.) He testified that he had "heard her voice being raised" in a way that was "upset" and "emotional" and that "at moments . . . could be disruptive." (*Id.*) Mary Miller, a Certified Registered Nurse Anesthetist who was formerly a colleague of Plaintiff, testified that she never observed Plaintiff losing her temper in the workplace and would not say that she has a bad or explosive temper. (Ex. 8 (Miller Dep.) to Pl.'s Opp. [Doc. # 78-8] at 15.) Similarly, Dr. Mardani, another former colleague of Plaintiff, testified that he had a "very good relationship" with Plaintiff and never had any problems in the workplace with Plaintiff. (Ex. 7 (Mardani Dep.) to Pl.'s Opp. [Doc. # 78-8] at 14.) Ms. Lutner testified that Dr. Soliman was the only person at DKH who "reported to" her that Plaintiff had "lost her temper at work." (Ex. 6 (Lutner Dep.) to Pl.'s Opp. [Doc. # 78-6] at 70.) Ms. Lutner also testified that she would not describe Plaintiff as having an "explosive temper" based on Ms. Lutner's "definition of 'explosive,'" because Ms. Lutner viewed explosive as indicating "also scary," and she did not "think Dr. Qamar was ever scary." (*Id.* at 172.)

Dr. Schimmel testified that his method of discipline for Dr. Qamar was to "have a conversation with her about the unacceptability of her behavior." (Ex. A (Schimmel Dep.) to Defs.' Mot. for Summ. J. [Doc. # 72-3] at 16-17.) Dr. Schimmel also testified that when he witnessed Plaintiff's behavior, he would "break that shouting match up and bring it to another location." (*Id.* at 16.) He did not document or formally report the incidents and instead responded by "verbally speaking with her and whoever else was" involved. (*Id.* at 17.) In response, Dr. Schimmel testified that Plaintiff "would typically become very defensive and, you know, sort of he started it or she started it, that kind of thing, and very -- it was a rant that I -- that I witnessed and -- and just had to stop the rant." (*Id.*) After those conversations, Plaintiff's "behavior would improve briefly, and then she would get into another rant on another occasion." (*Id.*) This behavior continued for "[p]retty much" the entire time Plaintiff was supervised by Dr. Schimmel. (*Id.*) Although Plaintiff's "clinical work

was adequate," Dr. Schimmel testified that he would have fired Plaintiff if it had been easier to find a qualified replacement, but he did not because "it's extraordinarily hard to find replacements" and there were "very few people who wanted to come work" in their location. (*Id.*)

Plaintiff testified that Dr. Schimmel was "[n]ot a laid back manager," but said that his management style "was working," and that although there "were some issues with the hospital," including that "the hospital wanted him to do a little more, . . . all of us . . . were mostly happy with Dr. Schimmel. And if there was any issue, he always resolved the issue. He's always listened and always took care of it." (Ex. B. (Qamar Dep.) to Defs.' Mot. for Summ. J. [Doc. # 72-4] at 98:13-25.)

Michaela Hubbard, a CRNA and former colleague of Plaintiff at DKH, testified that she believed that gender discrimination impacted her experience working at DKH because she "fe[lt] that the male counterparts . . . were all kind of put on this pedestal. They could do no wrong. If they needed something, they got it, where I asked for very little . . . and I just feel that every time I brought it up, [I]" was not accommodated in the same manner. (Ex. 4 (Hubbard Dep.) to Pl.'s Opp. [Doc. # 78-4] at 33-35.) Ms. Hubbard testified that she witnessed treatment of anesthesiologists which she perceived to be unfair, explaining that she perceived male anesthesiologists to be assigned more favorable post-call assignments than Plaintiff. (*Id.* at 35-40.)

### B.  Dr. Soliman's Tenure As Chief

In January 2015, Dr. Schimmel stepped down as Chief of Anesthesia, and Dr. Ahmed Soliman became the new Chief at DKH, and thus he replaced Dr. Schimmel as Plaintiff's supervisor. (Parties' L.R. Stmts. ¶ 11.) Around the time Dr. Soliman became Chief, Dr. Graham testified that there was "a certain unhappiness" with anesthesia services at DKH. (Graham Dep. at 30-31.) Dr. Soliman's management style differed from that of Dr. Schimmel. (Parties' L.R. Stmts. ¶ 13.) Dr. Schimmel described himself as "a compromiser" and testified that he

4

and Dr. Soliman had "different styles of leadership." (Schimmel Dep. at 70.) Dr. Schimmel testified that "initially," Dr. Soliman "would just, sort of, give orders, you know: You're going to do this. You're going to do that." (*Id.*) Dr. Schimmel's "observation was that [Dr. Soliman] was more dogmatic than he had to be or should be," but "over time he mellowed and became a better Chief as a result." (*Id.*) Dr. Graham testified that "[t]here was more oversight" under Dr. Soliman than there had been under Dr. Schimmel. (Graham Dep. at 28.) Some Sheridan staff working at DKH expressed concerns about Dr. Soliman's management style after he took over as Chief. (Parties' L.R. Stmts. ¶ 15.) Plaintiff testified that she "didn't respect Dr. Soliman" but "was never disrespectful in [her] discussion with him." (Qamar Dep. at 151.)

Dr. Schimmel testified that while he was Chief and while Dr. Soliman was Chief, Plaintiff "had this idea that she was the hardest-working person in the group and that somehow everybody was taking advantage of her," including by "letting somebody go [home] before she should have gone home." (Schimmel Dep. at 55.) Dr. Schimmel described Plaintiff as "paranoid" and said she was "getting more and more focused on . . . the fact that she thought she was being treated unfairly." (*Id.*) He testified that Plaintiff would "take a tally of who was still working and who wasn't and what they were doing and, you know, try to figure out whether she was being screwed," and then would "challenge me or she would challenge anybody who was, let's say, making those decisions on that particular day." (*Id.* at 55-56.) Dr. Schimmel also testified that Plaintiff would "become very vocal about it" "if she thought that somebody had been dismissed before she was dismissed and she thought she should have been the one to be dismissed before." (*Id.* at 56-57.)

### C.  March 2016 Investigation

Dr. Soliman testified that on March 18, 2016, he met with Plaintiff and told her that he "would like her to perform like every other person in the department, following these rules and regulations." (Soliman Dep. at 100.) He set "expectations" for job performance of "an anesthesiologist at Day Kimball," and Plaintiff "did not like that." (*Id.*) That same day,

following that meeting, Plaintiff emailed Dr. Roger Brown, Regional Medical Director for Sheridan, to complain about Dr. Soliman. (Ex. C (Qamar Email to Brown) to Def.'s Mot. for Summ. J. [Doc. # 72-4].) She wrote that Dr. Soliman had "created a very toxic work environment," that "[h]is behavior is highly demeaning and unprofessional," that he is "not collegial," and that he "treats us like slaves or peasants." (*Id.*) Plaintiff wrote that Dr. Soliman "simply does not do his fair share" and "no one trusts him." (*Id.*) She wrote that she is "afraid of clinical errors." (*Id.*) Plaintiff wrote that "[w]hen confronted," Dr. Soliman's "behavior becomes retaliating." (*Id.*) Plaintiff wrote that during their meeting, Dr. Soliman "accused [her] of not helping out yesterday," which was "an absolute lie." (*Id.*) She urged Dr. Brown to give Dr. Soliman "a lie detector test," because "he will fail 100%." (*Id.*) Plaintiff wrote that she was concerned that "someone like [Dr. Soliman] can come and try to ruin my reputation and make the department like a first grade classroom." (*Id.*) She described Dr. Soliman as "highly unprofessional and demeaning" and described his behavior as "pure harassment." (*Id.*)

Several days later, representatives of Sheridan including Deborah Lutner and Dr. Benjamin Guslits traveled to DKH to investigate Plaintiff's concerns, but Plaintiff alleges that the investigation "transformed into an investigation against Plaintiff." (Parties' L.R. Stmts. ¶ 34.) Ms. Lutner and Dr. Guslits met with six DKH employees and three Sheridan employees, including Plaintiff and Dr. Soliman. (*Id.* ¶ 35.) During this time, two surgeons submitted letters to Sheridan which positively described Plaintiff's work. (*Id.* ¶ 37.) Dr. Guslits testified that by submitting those two letters, "Dr. Qamar made her clinical performance part of the whole investigation of Dr. Soliman," and during that investigation, certain issues with her performance were raised, although they "were not really the focus" and "just happened to be part of a complete investigation." (Ex. K (Guslits Dep.) to Def.'s Mot. for Summ. J. [Doc. # 72-4] at 138, 143.) Dr. Guslits testified that as a result of the investigation, with regard to Plaintiff's clinical skills, "there were no findings or recommendations that needed to be followed up on from that at least from my standpoint." (*Id.* at 143.)

On March 25, 2016, Dr. Guslits emailed others in management at Sheridan to review the findings of that investigation. He noted a couple reported issues with placing epidurals and blocks, but "[u]niformly, the surgeons interviewed felt that Dr. Qamar's clinical skills and decision-making abilities were good." (Ex. L (March 2016 Guslits Email) [Doc. # 72-4].) Dr. Guslits wrote that Plaintiff "felt that she was not required to arrive" at a certain time on some days, and it "became apparent" that other doctors "covered for Dr. Qamar's tardiness." (*Id.*) He wrote that "Dr. Qamar felt she was the hardest working physician in the group." (*Id.*) His email continued:

> Dr. Soliman commented that Dr. Qamar is unwilling to work and has an explosive temper. We were also told that she is not a team player by Dr. Chervenkov. She refuses to carry the anesthesiologist phone and therefore, frequently cannot be contacted. Dr. Qamar will frequently refuse to work on days post-call, and when she is working, requests routine breaks. . . . In further review, it was noted that Dr. Qamar would constantly question the anesthesiologist-in-charge's decisions about running the board. . . . She interpreted changes in assignments by the anesthesiologist in charge, and particularly by Dr. Ahmed [Soliman], as retaliatory. . . . One surgeon made an interesting, though unsubstantiated observation. He thought that much of the difficulty that Dr. Ahmed [Soliman] and Dr. Qamar were facing was cultural, relating to their heritages and perceived male/female roles in their respective societies. Finally, it was noted, and confirmed by the knowledge possessed by all of those interviewed, that Dr. Qamar has not respected the chain of command within Sheridan. Rather than discussing her issues with Dr. Ahmed [Soliman], Dr. Brown or Ms. Parsons [Deborah Lutner], she has taken her concerns to the surgeons and nurses of [DKH]. Remarkably, Dr. Qamar also had her brother, a cardiologist in Florida, contact Dr. Ahmed [Soliman] on her behalf. This included multiple text messages and phone calls to Dr. Ahmed [Soliman] and included one text message describing her temperament.

(*Id.*)

His email described their "[a]ssessment" of Plaintiff:

Dr. Qamar[] is not respectful of Dr. Ahmed [Soliman] as department chair or as the anesthesiologist-in-charge. Her ability to function as part of a team of clinicians is lacking and her concept of professionalism is flawed. Dr. Qamar's clinical skills are adequate and after addressing complaints, her clinical performance has been good.

(*Id.*) Dr. Guslits also wrote that Dr. Soliman "needs to improve his communication skills with the physicians" and that he struggles with "[d]elegation of clinical responsibilities." (*Id.*)

In the "Recommendations" section, Dr. Guslits wrote that "Dr. Qamar was provided with a list of expectations regarding her professional behavior" which were "reviewed with her in detail," and she "was informed that these were minimum expectations for her" and that her compliance would be reviewed in six to eight weeks. (*Id.*) They also "discussed with Dr. Qamar that she was a Sheridan employee and that issues regarding employment should be brought up through the chain of command within the company," and "[t]here is no reason to discuss employment concerns with surgeons or nurses at the hospital." (*Id.*) He also wrote that Dr. Soliman "needs to have one-on-one mentoring on a regular and frequent basis" and "needs to be able to observe his behavior and mannerisms objectively and receive counseling in how best to approach issues, both clinical and administrative, in the department." (*Id.*) Dr. Guslits committed to return in May 2016 to check in with Plaintiff, which he did. (*Id.* ¶ 49.) Plaintiff testified that she had no recollection of the substance of that meeting. (Qamar Dep. at 195, 197-98.)

Following the investigation and recommendations, Plaintiff's professionalism improved, and in October 2016, Dr. Soliman "marked Plaintiff as meeting expectations in all but one category" on a performance review. (Parties' L.R. Stmts. ¶¶ 55-56.)

### D.  Plaintiff's Termination

More than one year later on December 4, 2017, Dr. Soliman circulated a performance review for Plaintiff. (*Id.* ¶ 58.) That review gave Plaintiff a score of "1," the lowest possible score which indicates "below expectations," in all "Professional Behavior" skills. (Ex. J (2017 Review and PIP) to Def.'s Mot. for Summ. J. [Doc. # 72-4].) All other skills were rated as "meets expectations," except "Medication Handling," which was also rated as "below expectations." (*Id.*) Along with that review, Dr. Guslits decided to place Plaintiff on a Performance Improvement Plan ("PIP"). (*Id.* ¶ 59.) The PIP listed Plaintiff's "Opportunities

for Development" as "1) Arguing and controlling your temper . . . 2) Delegating other providers to do your assignments . . . 3) Clock watcher . . . 4) Unaccepting feedback, constructive criticism and being on the defense right from the start with increasing temper and tone of the conversation . . . 5) Complaining to all personnel at the hospital . . . 6) Regarding clinical aspects, OB skills continue to be a point of complaint . . . ." (2017 Review and PIP.) The PIP outlined expectations to remedy that behavior. (*Id.*)

On December 7, Dr. Soliman met with Plaintiff and Juanita Brown, Practice Manager for Sheridan, to discuss the PIP. Dr. Soliman testified that Plaintiff was "very emotional" at that meeting, including that she was "[u]pset" and speaking with a "high voice." (Soliman Dep. at 251-52.) Dr. Soliman testified that Ms. Brown said to Plaintiff that she could "see what Dr. Soliman was talking about your professionalism" as a result of Plaintiff's behavior during that meeting. (*Id.*) Dr. Soliman also testified that Plaintiff acted with "aggressiveness" and was "unprofessional," "yelling," and "[b]eing aggressive" during that meeting. (*Id.* at 252.) He testified that she was "[n]ot accepting what" they were asking her to do, including by saying "I am not doing this. I am not the one that – I am very professional." (*Id.*) Although Plaintiff was "very upset," she signed the PIP during that meeting. (*Id.* at 253.)

Plaintiff asserts that she was fully compliant with the terms of her PIP as of December 22, 2017, the date of her last PIP check-in meeting with Dr. Soliman. (Pl.'s Add'l L.R. Stmt. [Doc. # 77-1] ¶ 6.)

On December 30, 2017, Plaintiff sent a series of text messages to colleagues. (Parties' L.R. Stmts. ¶ 63.) She wrote that "after all the mental torture and professional abuse that I have suffered at the hands of Dr Soliman and Sheridan[']s inability to provide any me protection from this indecent evil being , the so called chief I am going to retain a lawyer ASAP next week and sue Dr Soliman and Sherid[a]n . I will keep you all informed." (Ex. M (12/30/17 4:47 p.m. Message) to Def.'s Mot. for Summ. J. [Doc. # 72-5].) In a separate message thread, she wrote:

> If I am writing this text it means something . I worked today in the OR . A simple easy day but I was terrified of Soliman . He was after me like a bloodhound . I was protecting myself everything …. I know what he did … 5 am I am compelled to tell you that tell him to back off until I leave and I am going to leave by all means to protect myself …… I am telling you that as much as I have to leave I want you people to stay and enjoy this place . So you have tell him to leave me alone !! If this does not happen I will have to go to the CEO of the hospital . You know Sheridan has failed to protect me before . If this happens it will not be good we will all be leaving together . Please do not show this text to Dr Soliman .

(Ex. P (12/30/17 5:29 a.m. Message) to Def.'s Mot. for Summ. J. [Doc. # 72-5].) Dr. Soliman was not among the recipients of those messages, but he received copies and forwarded them by email to Dr. Guslits, Deborah Lutner, Juanita Brown, and Roger Brown. (Parties' L.R. Stmts. ¶ 68; Ex. O (12/30/17 Soliman Email) to Def.'s Mot. for Summ. J. [Doc. # 72-5].)

On December 31, 2017, Plaintiff sent a text message to Dr. Graham which read:

> Dear Dr Graham , I spoke to you about all the harassment going on by [Dr.] Soli[man] . Friday he tempered with my drugs . After he came between me and my pt safety in quest of him framing me I was left with no option . though I wanted to leave quietly , I had to write to Sherid[a]n to come and talk to me and I want them to set some limits on him until I am here . I will be getting a personal lock box which has been my biggest concern since this trouble . One of my colleagues suggested . I am also retaining a lawyer for my safety and to know my rights under these circumstances . A very Happy New Year to you and your family.

(Ex. AA (12/31/17 Message to Graham) to Def.'s Mot for Summ. J. [Doc. # 72-5].) Plaintiff made similar accusations regarding drug "temper[ing]" to Juanita Brown:

> Dear JUANITA . I am really sorry to give this message to you but it has become critically important after yesterday . Dr Soliman tempered with my drugs in Rm 2 yesterday . I am threatened by him . He has no right to touch my drugs !!! Though I have decided to leave my job by all means and I have informed my friends at [DKH] also that Dec 2018 is my last month . . .  I cannot watch my back 24 hr at this place ! I was taking all the precautions to stay away from this dangerous person . He is after me like a bloodhound hound . I am really threatened by him . He has NO right to touch my drugs after what he has done to me . I want to see see you as soon as possible so that you can set parameters on him until I am here . he has been trying to be nice since that day at face but I will not trust him in a million years . Sheridan did nothing to protect me earlier . that is why I did not want to say anything and leave quietly after

finding a new job . But it seems he is still not at peace and is still after me like a bloodhound .

(Ex. CC (12/30/17 Message to Brown) to Def.'s Mot. for Summ. J. [Doc. # 72-5].)

On January 1, 2018, Plaintiff sent another text message to Dr. Graham which read:

Dear John after all the suffering I have set myself free . Yesterday I discussed the situation with kids also . My daughter was home for a few days and my mental and physical condition was miserable . I was not able to sleep ... Finally I am starting a new life today .... I donot care if Sheridan fires me tomorrow ! I am ready for it . I told them I will leave as soon I find a new job Or if Sheridan is unable to control Soli before I have a job . I know I have to leave for my professional Safety . . . . I am NO longer requesting confidentiality . You can tell anyone I have spoken to you about my concerns or unfair treatment . I donot want to live in fear . I will be making appointments and ta[l]king to you until I leave or get fired . I donot care if Soli o[r] his friends see me talking to you . Thankyou so much for all of your support .

(Ex. W (1/1/18 Message to Graham) to Def.'s Mot. for Summ. J. [Doc. # 72-5].)

Dr. Guslits testified that typically, an employee is given the full length of the duration of their PIP to improve their performance, barring any particularly egregious conduct. (Gustlits Dep. at 110.) He described Plaintiff's sending of these text messages as "extremely egregious" conduct during the pendency of her PIP because she "was creating an unsafe practice environment for the physicians and nurse anesthetists at that facility by her undermining of the chief." (*Id.*) He described those messages as "specifically perform[ing] the behavior" that was "specifically outlin[ed]" in her PIP. (*Id.* at 111.)

Thus, on that day, Dr. Guslits determined that Plaintiff's employment should be terminated. (Parties' L.R. Stmts. ¶ 70.) On January 1, 2018, Dr. Guslits contacted Plaintiff and instructed her not to report to work the following day, and on January 2, he told her not to report to work until further notice. (*Id.* ¶ 71.)

On January 5, Plaintiff spoke with Tony Ames, Sheridan's Human Resources Manager, and Anthony Katz, Sheridan's Director of Human Resources. (*Id.* ¶ 74.)  On that call, Plaintiff focused primarily on "the overarching [idea] that Dr. Soliman is a bad guy, that he harasses and treats [her] poorly," including going "through a lot of the history – the 2016 history" and

on "the patient safety issue of his tampering with her drugs on the tray." (Ex. U (Katz Dep.) to Def.'s Mot. for Summ. J. [Doc. # 72-5] at 183-84.) During that call, Plaintiff claimed that Dr. Soliman "was a chauvinist, sexist, and engaged in sexual harassment." (*Id.* at 189-90.)

Sheridan's Human Resources department then conducted an investigation of Plaintiff's claims of gender-based discrimination, including speaking with Plaintiff, Dr. Soliman, two CRNAs at DKH, and the Practice Manager, Juanita Brown. (Parties' L.R. Stmts. ¶¶ 75-76.) Following that investigation, Sheridan determined that Plaintiff's complaints of discrimination and retaliation were unsubstantiated. (*Id.* ¶ 77.) Ms. Lutner testified that she also spoke to Dr. Soliman about the medication tampering allegation, which he vehemently denied. (*Id.* ¶ 78.) Following the investigation, Dr. Guslits did not change his mind about his decision to terminate Plaintiff's employment, and thus he made her termination effective as of January 23, 2018. (*Id.* ¶ 79.) Dr. Soliman did not participate in the decision to terminate Plaintiff's employment, (*id.* ¶ 80), and he testified that "as a self-interest" he "wanted her to stay with us, but to perform on the level that we wanted her to perform at" because "it's very difficult to hire anesthesiologists in that area," (Soliman Dep. at 72.)

In January 2018, Plaintiff turned down a job offer from New York Presbyterian Hospital, although she asserts that she did not meet the credentialing criteria for board certification for the offered position at that time. (*Id.* ¶ 81.) In March 2018, Plaintiff turned down a job offer from UMass. (*Id.* ¶ 82.) In October 2018, Plaintiff accepted a job offer with Anesthesia Associates of Willimantic. (*Id.* ¶ 83.)

### E.  Plaintiff's Complaint

Count One of Plaintiff's Second Amended Complaint brings a claim of gender discrimination in violation of Title VII, 42 U.S.C. § 2000e-2. (Second Am. Compl. [Doc. # 28].) Count Two brings a claim of gender discrimination in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a)(1). Count Three brings a claim of retaliation in violation of Title VII, 42 U.S.C. § 2000e-3. Count Four brings a claim of

retaliation in violation of the CFEPA, Conn. Gen. Stat. § 46a-60(a)(4). Count Five brings a claim of free speech violation, in violation of Conn. Gen. Stat. § 31-51q. Count Six brings a claim of breach of contract. Count Seven brings a claim of defamation.

## II.  Discussion

### A.  Legal Standard

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

"The moving party bears the initial burden of showing why it is entitled to summary judgment." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where, as here, the nonmovant bears the burden of proof at trial, the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency

and not simply denying the opponent's pleadings." *Id.* at 272–73 (citing *Celotex*, 477 U.S. at 323). "If the movant makes this showing in either manner, the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Id.* (citing Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Like the movant, the nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id.* (citing *Celotex,* 477 U.S. at 324; *Matsushita,* 475 U.S. at 586).

### B.  Gender-Based Discrimination (Counts One and Two)

The Court will jointly analyze Plaintiff's gender discrimination claims under Title VII (Count One) and the CFEPA (Count Two) because they are governed by identical legal standards. *See Kaytor v. Elect. Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010). Claims arising under both statutes are analyzed under the *McDonnell-Douglas* three-part burden shifting framework. *See Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014); *Craine v. Trinity Coll.*, 259 Conn. 625, 637 (2002).

Under that burden-shifting framework, a plaintiff must show facts to establish a *prima facie* case of discrimination: (1) that she was a member of a protected class; (2) that she was qualified for her position; (3) that she suffered an adverse employment action; and (4) that the circumstances of the adverse action give rise to an inference of discrimination. *See, e.g., Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015). If the plaintiff states a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Walsh*, 828 F.3d at 75. Finally, if the defendant articulates a legitimate, non-discriminatory reason for the adverse action taken, then the burden shift backs to the plaintiff to prove that the defendant's asserted reason is actually a pretext for discrimination. *See id.* at 83.

In opposing Defendant's Motion for Summary Judgment, Plaintiff did not identify the specific adverse employment action(s) she asserts were motivated by discrimination. But at

oral argument, Plaintiff focused on two separate decisions by Defendant. First, Plaintiff argues that the assignment of supervisory tasks—specifically, "running the board"—was discriminatory. Second, Plaintiff argues that the decision to terminate her employment was discriminatory. The Court will address each employment action in turn.

###### i.     Running the Board

Running the board "is the role of the anesthesiologist in charge of assigning cases for the day." (Pl.'s Opp. to Def.'s Mot. for Summ. J. [Doc. # 79] at 3.) Plaintiff alleges that "[t]hroughout Dr. Soliman's tenure as Chief, he delegated duties unequally based on sex" in that she was "the only female anesthesiologist" and "was also the only anesthesiologist not permitted to 'run the board.'" (*Id.*) Defendant argues that it is entitled to summary judgment on this allegation of gender discrimination because any decision not to assign Plaintiff to run the board was not an "adverse employment action." Thus, Defendant argues, Plaintiff cannot state a *prima facie* case of discrimination as to running the board.

An adverse employment action occurs where an employee "endures a materially adverse change in the terms and conditions of employment." *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007). "To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* "A change that is materially adverse could consist of, *inter alia*, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* (internal quotation and alteration omitted).

The denial of "professional development opportunities . . . 'may constitute an adverse employment action, but only where an employee can show material harm from the denial, such as a failure to promote or a loss of career advancement opportunities.'" *Zoulas v. New York City Dep't of Educ.*, 400 F. Supp. 3d 25, 55 (S.D.N.Y. 2019) (quoting *Trachtenberg v. Dept. of Ed. of City of New York,* 937 F. Supp. 2d 460, 468 (S.D.N.Y 2013)).

Plaintiff's Complaint alleges that running the board entailed "supervisory opportunities, prestige, and promotional opportunity." (Second Am. Compl. ¶ 33.) But she makes no arguments and identifies no evidence in the record to suggest that running the board provided promotional opportunity or otherwise advanced the careers of those who were permitted to run the board. Moreover, Plaintiff makes no argument as to why or how the alleged loss of "prestige" related to running the board might constitute significantly diminished material responsibilities or otherwise produced material harm.  (*See generally* Pl.'s Opp.; Pl.'s L.R. Stmt.)

In the absence of any evidence which might permit an inference that a denial of the opportunity to run the board caused Plaintiff to lose career advancement opportunities, produced significantly diminished material job responsibilities, or otherwise materially impacted her employment, no reasonable finder of fact could conclude that Plaintiff suffered an adverse employment action because she did not run the board. Thus, Defendant is entitled to summary judgment on Counts One and Two as to Plaintiff's claims of gender discrimination in assigning who ran the board.

### ii.    Termination

Separately, Plaintiff argues that the termination of her employment was motivated by gender discrimination.

Defendant argues that it is entitled to summary judgment on these claims because "[n]othing about the[] circumstances" of Plaintiff's termination "gives rise to an inference of discrimination, and Plaintiff cannot demonstrate that" Defendant's legitimate, non-discriminatory reason for terminating her employment was "mere pretext for terminating her on the basis of her sex." (Def.'s Mem. Supp. Mot. for Summ. J. [Doc. # 72-1] at 15-16.) Defendant asserts that it terminated Plaintiff specifically because she "sent a text message to her colleagues, denigrating her Chief, within weeks of being placed on a PIP regarding her lack of professionalism." (Def.'s Mem. at 15.) According to Defendant, "Plaintiff has ***no***

16

evidence that the decision maker in this case, Dr. Guslits, had any discriminatory bias," especially because "Dr. Soliman was not involved in the decision to terminate Plaintiff's employment, and it is undisputed that he did not want her employment to be terminated." (*Id.* at 16.)

Plaintiff's opposition fails to identify any evidence in the record suggesting that Defendant's stated reason for terminating Plaintiff's employment was pretextual. (*See* Pl.'s Opp. at 17-18.) At oral argument, Plaintiff argued that a factfinder could infer pretext from evidence suggesting that Defendant changed its stated reasons for Plaintiff's termination, citing the letter terminating Plaintiff's employment and a letter sent to Plaintiff's counsel. (*Compare* Ex. X (1/23/18 Termination Letter) to Def.'s Mot. for Summ. J. [Doc. # 72-3] (terminating Plaintiff's employment "for cause" "pursuant to section 10(c) of your Employment Agreement") *with* Ex. 46 (1/23/18 Letter to Pl.'s Counsel) to Pl.'s Opp. [Doc. # 78] ("Dr. Qamar failed to demonstrate substantial and sustained improvement of the performance deficiencies noted in her Performance Improvement Plan.").)

But in comparing those letters, the Court disagrees that Defendant provided inconsistent explanations for its decision to terminate Plaintiff such that its explanation gives rise to an inference of discrimination. The record evidence makes clear that Defendant consistently identified Plaintiff's behavioral issues—specifically, the text messages sent while she was subject to the Performance Improvement Plan—as the reason for Plaintiff's termination. Moreover, just like the Termination Letter, the letter to Plaintiff's counsel confirms that Plaintiff was terminated "for cause." Although the letter to her counsel notes Plaintiff's failure to "demonstrate substantial and sustained improvement" under her PIP, it does not suggest that her termination was for any reason other than "for cause" under her Employment Agreement. Moreover, the PIP itself notes that if Plaintiff fails to "show immediate and sustained improvement through the PIP time frame, further action will be necessary" and could include "termination of your employment . . . in accordance with your

employment contract." (2017 Review and PIP.)  Thus, the Court sees no inconsistency in Defendant's explanation of its decision to terminate Plaintiff's employment.

Separately, Plaintiff suggested at oral argument that Defendant's stated reason for her termination gives rise to an inference of discrimination because Defendant claims that Plaintiff failed to show sustained improvement under her PIP, but in fact, Plaintiff did show sustained improvement throughout the majority of the time period covered by her PIP. The PIP was dated December 6, 2017, and the Court sees no evidence in the record of any issues with Plaintiff's performance under the PIP until her text messages of December 30, 2017.

Nonetheless, the Court rejects Plaintiff's suggestion that her satisfactory performance during that period calls into question Defendant's conclusion that Plaintiff failed satisfy the terms of her PIP. The PIP required Plaintiff to, *inter alia*, "gain control of anger management issues and communicate with staff and coworkers without losing her temper and use . . . more professionalism." (*Id.*) Plaintiff's text messages of December 30-31, 2017 and January 1, 2018—well within the PIP's 30-day period—are undoubtedly contrary to that required improvement.  No reasonable factfinder could infer that simply because Plaintiff was compliant with the terms of her PIP from December 6 through December 30, Defendant's decision to terminate her employment in response to the text messages was pretext for discrimination.

Thus, in the absence of any evidence in the record upon which a jury could conclude that Defendant's stated reason for Plaintiff's termination was pretext for discrimination, Defendant is entitled to summary judgment on Counts One and Two as to Plaintiff's claims of gender discrimination in terminating her employment.

### C.  Gender-Based Retaliation (Counts Three and Four)

Title VII makes it unlawful for an employer to discriminate against an employee "because he [or she] has opposed any practice made an unlawful employment practice by this subchapter, or because he [or she] has made a charge . . . in an investigation, proceeding,

or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). The CFEPA prohibits employment discrimination against an employee "because such person has opposed any discriminatory employment practice." Conn. Gen. Stat. § 46a–60(a)(4). Plaintiff's Title VII and CFEPA claims of retaliation are subject to nearly identical legal standards and also follow a variation on the traditional *McDonnell-Douglas* burden-shifting framework. *See Kaytor*, 609 F.3d at 552, 556.

Plaintiff argues that her termination was in retaliation for her complaints "about harassment on the basis of sex in text messages in late December 2017 and more explicitly of sex discrimination in January 2018." (Pl.'s Opp. at 13.)

To establish a *prima facie* case of retaliation, a plaintiff "must show (1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kaytor*, 609 F.3d at 552. "At the summary judgment stage, if the plaintiff presents at least a minimal amount of evidence to support the elements of the claim, the burden of production shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse employment action." *Id.* at 552-53. "If the employer produces such evidence, the employee must, in order to avoid summary judgment, point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual." *Id.* at 553. A plaintiff must also demonstrate a causal connection between employer's retaliation and the adverse employment action.

The parties' dispute largely centers on whether Plaintiff can show that she "participated in an activity protected by Title VII." "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir. 2000). Protected activity need not "rise to the level of a formal complaint in order to receive statutory protection." *Id*. But comments which do not complain of discrimination—in other words, complaints about the workplace which do not implicate

the protections of Title VII—are not protected. *See Ochei v. Coler/Goldwater Memorial Hosp.*, 450 F. Supp. 2d 275, 287 (S.D.N.Y. 2006) (plaintiff did not engage in protected activity by "complaining about observations of her work"). Thus, although "[c]omplaints about conduct clearly prohibited by the statute need not mention discrimination or use particular language[,] . . . ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity." *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (plaintiff, a "female high-level manager," did not engage in protected activity by complaining "about having to perform secretarial work").

Defendant argues that Plaintiff's retaliation claims must fail because she did not engage in any protected activity prior to its decision to terminate her employment. Specifically, Defendant argues that Plaintiff "cannot establish she engaged in protected activity prior to January 5, 2018," the date of her telephone call with Defendant's Human Resources representatives, Tony Ames and Anthony Katz, where she alleged that Dr. Soliman was a chauvinist and engaged in sexual harassment. Because this call occurred after Dr. Guslits had already decided to terminate Plaintiff's employment in response to her text messages, Defendant argues that Plaintiff's speech on that call cannot form the basis of a retaliation claim. (*See* Def.'s Mem. at 18.)

Plaintiff responds that the January 5 call is not the first time she engaged in protected activity. (*See* Pl.'s Opp. at 12-13.) Specifically, Plaintiff refers to the 2016 investigation report's mention of gender roles: "One surgeon made an interesting, though unsubstantiated observation. He thought that much of the difficulty that Dr. Ahmed [Soliman] and Dr. Qamar were facing was cultural, relating to their heritages and perceived male/female roles in their respective societies." (March 2016 Guslits Email.) Mary Miller, a CRNA at DKH, also testified that she had raised concerns with Dr. Soliman regarding the quality of assignments distributed between men and women at DKH. (Miller Dep. at 22.) Then, in her December

20

2017 text messages, Plaintiff referred to "harassment going on by" Dr. Soliman, (12/31/17 Message to Graham) and to "the mental torture and professional abuse that I have suffered at the hands of Dr Soliman," (12/30/17 4:47 p.m. Message). Thus, according to Plaintiff, "a reasonable person in [Dr. Guslits's] position would have recognized that Dr. Qamar's complaints of harassment and abuse in [the] December 2017" text messages "related to sex and to conduct prohibited by the antidiscrimination laws." (Pl.'s Opp. at 13.) In other words, Plaintiff argues that because someone else had remarked to Dr. Guslits about their belief that her issues with Dr. Soliman were gender-based, and then Plaintiff later complained of "professional abuse" and "harassment" by Dr. Soliman, Plaintiff made protected allegations regarding gender discrimination prior to the decision to terminate her employment.

In support of her position that her text messages constitute protected activity when considered in context, Plaintiff relies only on *White v. City of Middletown*, 45 F. Supp. 3d 195 (D. Conn. 2014). (*See* Pl.'s Opp. at 13.) The relevant issue in *White* was whether the decisionmaker *learned* about the protected activity which the plaintiff had clearly engaged in by filing complaints with the Connecticut Commission on Human Rights and Opportunities. 45 F. Supp. 3d at 214-15. Specifically, Plaintiff relies on the *White* court's conclusion that it would not have been unreasonable to find that the decisionmaker was aware of the filing of a CHRO complaint even though he learned about it through the "rumor mill," not through any formal channels. *Id.* at 216 n.8. But Plaintiff's analogy to *White* is unconvincing. The issue here is not whether Dr. Guslits *learned* that Plaintiff had engaged in protected activity through remarks by other DKH employees. Rather, the issue is whether the remarks by other DKH employees *transform* Plaintiff's comments—which, taken alone, do not reference or imply gender-based discrimination—into protected activity.

The text messages sent by Plaintiff prior to Defendant's decision to terminate her employment complain of "harassment," "mental torture," and "professional abuse." But those messages alone do not suggest that the mistreatment of which Plaintiff complained was

gender-based. Rather, Plaintiff's messages describe an ongoing professional dispute with Dr. Soliman. Plaintiff described her abuse as "professional" and described Dr. Soliman as an "indecent evil being." (12/30/17 4:47 p.m. Message.) She indicated an intent to "retain a lawyer . . . and sue Dr Soliman and Sherid[a]n," but did not suggest that any such suit would allege discriminatory treatment. (*Id.*) Moreover, Plaintiff's messages largely focused on her suspicion that Dr. Soliman had tampered with drugs intended for one of her patients, and her claim of "harassment" appears to be linked to that suspicion.[1] Thus, in reviewing the messages sent by Plaintiff and drawing all reasonable inferences in Plaintiff's favor, the Court sees only "ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct." *Int'l Healthcare Exch., Inc.*, 470 F. Supp. 2d at 357.

Thus, Plaintiff's position that she engaged in protected activity prior to Defendant's decision to terminate her employment hinges on her assertion that her ambiguous text messages are nonetheless protected activity when considered in combination with earlier comments by third parties who raised gender-based concerns. But Plaintiff has not identified, and the Court has not otherwise found, any case which would suggest that otherwise ambiguous comments can be so transformed into protected activity via prior comments made by other individuals. The ultimate question is whether Plaintiff's messages "protest[ed] or oppose[d] statutorily prohibited discrimination," but Plaintiff's argument conflates the requirement "that she participated in an activity protected by Title VII" with the requirement "that her participation [in protected activity] was known to her employer."

---

[1] In particular, Plaintiff's message to Dr. Graham in which she complained of "harassment" appears to focus entirely on the drug tampering claim. (*See* 12/31/17 Message to Graham ("I spoke to you about all the harassment going on by [Dr.] Soli[man] . Friday he tempered with my drugs . After he came between me and my pt safety in quest of him framing me I was left with no option . though I wanted to leave quietly , I had to write to Sherid[a]n to come and talk to me and I want them to set some limits on him until I am here . I will be getting a personal lock box which has been my biggest concern since this trouble . One of my colleagues suggested . I am also retaining a lawyer for my safety and to know my rights under these circumstances.").)

Regardless of whether Dr. Guslits may have suspected that the issues between Dr. Soliman and Plaintiff were gender-based in light of earlier comments by third parties, the issue is whether Plaintiff herself "felt she was being discriminated against on the basis of sex" and put Defendant "on notice" of that feeling. *Int'l Healthcare Exch., LLC*, 470 F. Supp. 2d at 357. The Court concludes as a matter of law that Plaintiff did not engage in protected activity by sending the December 2017 text messages, and thus Plaintiff cannot demonstrate a *prima facie* case of retaliation. Defendant is entitled to summary judgment on Counts Three and Four.

### D.  Free Speech (Count Five)

Conn. Gen. Stat. § 31-51q prohibits employers from "subject[ing] any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer." Plaintiff argues that she was terminated for exercising free speech rights protected by the Connecticut state constitution. (*See* Pl.'s Opp. at 8-10.)

The free speech protections offered to both public and private employees by the Connecticut constitution are determined using "a slightly modified form of the [federal] *Pickering/Connick* test," which determines a public employee's First Amendment right to free speech in the workplace by balancing the interests of the employee in commenting upon matters of public concern and the interest of the employer in promoting the efficiency of the public services it performs through its employees. *See Trusz v. UBS Realty Investors, LLC*, 319 Conn. 175, 178 (2015). Specifically, "under the [Connecticut] state constitution, employee speech pursuant to official job duties on certain matters of significant public interest is protected from employer discipline" in both public and private workplaces under § 31–51q.

*Id.* Under this standard, an employee's speech is protected only when that speech "is on a matter of public concern and implicates an employer's official dishonesty, other serious wrongdoing, or threats to health and safety." *Id.* at 212 (internal quotation omitted). "[I]f an employee's job related speech reflects a mere policy difference with the employer, it is not protected." *Id.*

"[W]hether the subject matter addressed by a particular statement is of public concern involves a question of law for the court." *Daley*, 249 Conn. at 777. But "whether a particular statement addresses such a matter depends on its content, its form, and the context in which it is made," and thus is "necessarily . . . a question of fact." *Id.*

Defendant argues that Plaintiff "cannot establish a prima facie case of retaliation because her speech . . . was *not* constitutionally protected" and because that speech "did not *cause* any adverse employment action." (Def.'s Mem. at 22.) Defendant argues that Plaintiff's speech does not fall into any of the categories protected under *Trusz*: official dishonesty, deliberately unconstitutional acts, other serious wrongdoing, or threats to health and safety. (*Id.* at 23-24.) Defendant describes Plaintiff's speech as a "mere policy difference with Dr. Soliman on how to run the department of anesthesiology at DKH." (*Id.* at 24.) And as to Plaintiff's claim that Dr. Soliman tampered with her medication, Defendant argues that "Plaintiff was unable to identify any potential harm to the patient" and thus was not discussing "health and safety." (*Id.*)

Plaintiff responds that her "speech regarding tampering with drugs she intended to administer in an operating room setting raises a matter of public concern under § 31-51q because her speech related to the topic of patient safety." (Pl.'s Opp. at 9.) In support of her position that speech regarding "patient care" is protected under the "health and safety" prong of the *Trusz* test, Plaintiff relies on *Cobb v. Atria Senior Living, Inc.*, 2018 WL 587315 (D. Conn. Jan. 29, 2018). The *Cobb* court denied a motion to dismiss the plaintiff's § 31-51q claim based on speech protected by the Connecticut constitution. In that case, the plaintiff

was terminated after he provided information to the Department of Health during an ongoing investigation into the death of an elderly resident at the facility where he worked. The plaintiff alleged that he was "very concerned" about the accuracy and honesty of information provided to the Department of Health by his employer, the defendant in that case, and thus the court concluded that the plaintiff's "allegations set forth a plausible claim that his statements to the DOH investigator outside of his workplace interviews were, at least in part, a comment on Defendants' 'official dishonesty' or 'serious wrongdoing.'" *Id.* at *9. Because, in "drawing all reasonable inferences in [the plaintiff's] favor," the *Cobb* court also found that the plaintiff's concerns for "'providing responsible and effective patient care' in the wake of a resident's death suggests that his speech may also have been a comment on 'threats to health and safety,'" it concluded that the plaintiff had also made sufficient allegations under that prong of the *Trusz* test. Plaintiff argues that as in *Cobb*, her "texts to colleagues regarding medication tampering by Dr. Soliman constituted protected activity." (Pl.'s Opp. at 10.)

But Plaintiff focuses only on whether her comments touched on the topic of "health and safety" without addressing the underlying requirement of the *Trusz* framework. Under *Trusz*, speech is protected "*only when*" it "is on a matter of public concern *and* implicates . . . threats to health and safety." *Trusz*, 319 Conn. at 212 (emphasis added). Thus, comments on health and safety are not protected unless they are *also* on "a matter of public concern" or a "matter[] of significant public interest."

Although Plaintiff's comments were arguably about health and safety, she makes no argument to suggest that a single allegation of medication mishandling at one hospital by one doctor on one occasion would be a matter of "significant public interest." Plaintiff's analogy to *Cobb* only highlights this failing, as the plaintiff in *Cobb* had shared his health and safety concerns in the context of an ongoing government investigation of his employer's facility. Although significance of the public interest in the results of a government health

25

investigation is clear, the significance of any public interest in Plaintiff's allegation about the handling of medication for one patient at DKH is not.

The Court declines to adopt Plaintiff's position, which would deem virtually any comment by a healthcare worker expressing concern about patient care to be a "matter of significant public interest" under *Trusz* simply because it touches on the topic of one individual's "health and safety." Plaintiff's comments were not protected speech, and thus Defendant is entitled to summary judgment on Count Five.

### E.   Breach of Contract (Count Six)

"The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Hawley Ave. Assocs., LLC v. Russo*, 130 Conn. App. 823, 832 (2011). "[I]n ruling upon a motion for summary judgment, [courts] construe ambiguous contractual terms in favor of the party opposing the motion." *Bouzo v. Citibank, N.A.*, 96 F.3d 51, 59 (2d Cir. 1996). Thus, "in a contract dispute, summary judgment may be granted only where the language of the contract is unambiguous." *Id.* (internal quotation omitted).

Defendant argues that it "had cause to terminate Plaintiff's contract, which specifically identified 'negligence' and 'commission of acts that in any way jeopardize or damage the professional integrity, reputation or relationship of the Company or any of its Affiliates'" as permissible reasons for termination. (Def.'s Mem. at 26.) Defendant cites the testimony of Dr. Guslits, who indicated that Plaintiff's messages created an "unsafe practice environment" because Plaintiff was undermining the leadership of the Chief, whose leadership the anesthesiologists must follow to ensure quality patient care. (*Id.* (quoting Guslits Dep. at 110-111).) Defendant also argues that Plaintiff's messages "placed the professional integrity of Dr. Soliman in question, thus potentially damaging Sheridan's professional integrity, reputation, and relationship with DKH, in violation of her contract." (*Id.*) Because, according to Defendant, these messages fall within the "for cause" provisions

of Plaintiff's Employment Agreement, Defendant did not breach that agreement by terminating her. (*Id.*)

Plaintiff argues that terms like "negligence, malfeasance, misfeasance, and the commission of acts that damage the Company's reputation" are "ambiguous terms . . . not defined within the contract." (*Id.* at 19.) Thus, she argues, "their meaning is necessarily a question of fact that cannot be determined on summary judgment." (*Id.*) Plaintiff contends that "Defendant has failed to meet its burden to demonstrate the absence of material factual issues relating to the meaning of the terms of the contract and as to whether the contract was breached." (*Id.*)[2]

Defendant responds that the absence of a specific definition of the terms at issue within the contract itself does not render those terms ambiguous. The Court agrees. The provision of the Employment Agreement under which Defendant terminated Plaintiff's employment uses terms with plain, well-established meanings which did not require further definition within the contract itself. The Court rejects Plaintiff's suggestion that those terms are ambiguous simply because they are not "defined within the contract" and "[t]herefore" their meaning is "necessarily a question of fact." (Pl.'s Opp. at 19.) *See Jemiola Trustee of Edith R. Jemiola Living Trust v. Hartford Cas. Ins. Co.*, 335 Conn. 117, 135 (2019) ("We will not read words to introduce ambiguity when, considering the common, ordinary meaning of those words as applied to the particular factual context presented, it is apparent that the words are in no way unclear or uncertain.").

Plaintiff argues that even if the terms of her Employment Agreement were unambiguous, "whether Defendant breached the contract is a question of fact left to a trier

---

[2] Plaintiff also argues that her Employment Agreement was a "contract of adhesion," and thus that any ambiguity in contract terms should be interpreted in her favor. But she fails to make any argument or point to any evidence in the record suggesting that her Employment Agreement was in fact a "contract of adhesion" beyond an unexplained reference to "boilerplate" language. (*See* Pl.'s Opp. at 18-19.)

of fact." (Pl.'s Opp. at 19.) But Plaintiff admits that there "is no dispute that Defendant terminated Plaintiff's employment because of statements made by Plaintiff in text messages." (*Id.*)

Plaintiff argues nonetheless that those messages "asserted harassment and other serious misconduct by Dr. Soliman" and thus were not properly the basis for her termination. (*Id.*) In support of this argument, Plaintiff relies only on the deposition testimony of Mr. Katz. (*Id.* (citing Katz Dep. at 161-62).) Mr. Katz testified that *if* a complaint of harassment is "protected action," then it "should not be a reason for termination." (Katz Dep. at 162.) Thus, Plaintiff argues, there is a "material factual issue" relating to whether Defendant breached the Employment Agreement in terminating Plaintiff in response to her December 2017 text messages. But Plaintiff's text messages were not protected activity, *see supra* § II.C, and thus Mr. Katz's testimony creates no genuine dispute of material fact regarding whether Defendant breached the Agreement in terminating Plaintiff in response to the text messages.

Relying on the unambiguous terms of Plaintiff's Employment Agreement, and even drawing all inferences in Plaintiff's favor, the Court concludes that no reasonable jury could find that Defendant breached the Employment Agreement in terminating Plaintiff's employment for cause. Defendant is entitled to summary judgment on Count Six.

## F. Defamation (Count Seven)

Plaintiff asserts that "the allegations in the December 2017 PIP document and a January 2018 statement . . . provided to Defendant's management that Plaintiff refused to work, performed minimal work, had an out of control temper, lacked clinical skills, failed to supervise an anesthetic procedure performed by a CRNA, and being a disruptive physician" were defamatory. (Pl.'s Opp. at 21.)

A defamatory statement is one "that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Cweklinsky v. Mobil Chemical Co.*, 267 Conn. 210, 217 (2004). "To establish

28

a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Hopkins v. O'Connor*, 282 Conn. 821, 838 (2007).

 "To be actionable, the statement in question must convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion." *Id.* The truth of a statement of fact is generally a question of fact for the jury. *See Cweklinsky*, 267 Conn. at 228-29.

But certain defamatory statements are not actionable because they are protected by privilege. In employment settings, statements made between management regarding an employee's performance and employment status are protected by a qualified privilege. *See Torosyan v. Boehringer Ingelheim Pharm.*, 234 Conn. 1, 29 (1995) ("[C]ommunications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege. Such communications and documents are necessary to effectuate the interests of the employer in efficiently managing its business.").

Where that privilege applies, it can be overcome only by a showing that the privilege holder "acted with malice in publishing the defamatory material." *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 630 (2009). A plaintiff can defeat this privilege by showing that the speaker acted with either "actual malice," which requires "actual knowledge of [the statement's] falsity or reckless disregard for its truth," or "malice in fact," which is "the publication of a false statement with bad faith or improper motive." *Id.* at 633-34.

Defendant argues that it is entitled to summary judgment because the defamatory statements alleged by Plaintiff were privileged. Defendant explains that "all of Dr. Soliman's statements occurred in the context of evaluating or managing Plaintiff's performance and

correlating discussions with Sheridan management about the best way to do so," and that Plaintiff has not "adduced any evidence to support malice on the part of Dr. Soliman." (Def.'s Mem. at 30.)

Plaintiff concedes that Dr. Soliman's statements "were made in an intra-corporate context" but argues that the privilege is nonetheless "not available to Defendant in this case" at the summary judgment stage because it "is a question of fact" whether Dr. Soliman acted with malice. (Pl.'s Opp. at 23.) Plaintiff suggests that "[t]here is evidence in the record demonstrating that Dr. Soliman made false and defamatory statements about Plaintiff with reckless disregard as to their truth or falsity," and thus she argues that there is a genuine dispute of material fact as to whether Dr. Soliman acted with malice. (*Id.*)

Specifically, Plaintiff asserts that "Dr. Soliman accused Plaintiff of falsely calling out sick and conspiring with another employee to do so, despite his having no evidence to dispute that Plaintiff was sick with a high fever." (*Id.* (citing Soliman Dep. at 234).) But the cited page of Dr. Soliman's transcript does not indicate that Dr. Soliman "falsely" "accused" Plaintiff of calling out sick. Instead, Dr. Soliman testified that when Plaintiff called in sick and people were claiming that she and another employee were colluding, he did not write her up for being out sick that day and instead simply "asked her" whether she had been sick. (Soliman Dep. at 234.) Because Plaintiff told him that "she was sick" and "had a high fever," Dr. Soliman "didn't investigate" the claims of collusion. (*Id.*) The Court disagrees with Plaintiff's suggestion that this testimony creates a genuine dispute of fact as to whether Dr. Soliman made those or any other challenged statements with malice.

Plaintiff has specifically identified no other evidence which might support an inference that Dr. Soliman acted with malice, and the Court sees none in the record. Plaintiff states conclusorily that "[w]hether this qualified privilege is defeated is a question of fact." (Pl.'s Opp. at 23.) But absent any record evidence which creates a genuine dispute of fact as

to Dr. Soliman's knowledge or intent, Defendant has demonstrated that the statements at issue were privileged and is entitled to summary judgment on Count Seven.

### III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. # 72] is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.

_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 6th day of August 2020.